# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 20, 2010

Lyle W. Cayce
Clerk

No. 09-50659

ALEJANDRO HERNANDEZ

Plaintiff-Appellee

v.

JESUS TERRONES, et al.

Defendants-Appellants

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:08-CV-00222

Before JONES, Chief Judge, PRADO, Circuit Judge, and OZERDEN[*], District Judge.

PER CURIAM:[**]

Defendants Jesus Terrones, Guillermo Martinez, Arturo Ruiz, Jr., Antonio Tabullo, Joe Zimmerly, and Pedro Ocegueda take an interlocutory appeal from the district court's partial denial of their Motion for Summary Judgment in an action brought by Plaintiff pursuant to 42 U.S.C. § 1983. They argue that Plaintiff's due process claims are time-barred, and that they are otherwise

---

[*] District Judge, Southern District of Mississippi, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-50659

entitled to qualified immunity on Plaintiff's § 1983 claims. We decline to exercise pendent jurisdiction over Defendants' statute of limitations defense, and dismiss this part of the appeal. Because we conclude that Defendants' actions did not violate Plaintiff's clearly established constitutional rights, we reverse the denial of their motion for qualified immunity, and remand to the district court for entry of summary judgment in favor of Defendants on Plaintiff's individual capacity § 1983 claims against them.

## I. BACKGROUND

### A.    Factual Background

#### 1.    The Investigation

The undisputed facts, along with the relevant disputed material facts resolved in Plaintiff's favor, establish the following chain of events. On May 11, 1994, the body of Robert Cobb, a homeless Vietnam veteran, was discovered in a desert area by officers of the El Paso Police Department. Cobb had been stabbed multiple times, and had suffered blunt force trauma to the head. His body was found next to his vehicle, a 1986 Pontiac Trans-Am automobile. El Paso Police Sergeant Pedro Ocegueda named Detective Jesus Terrones as the case agent to investigate Cobb's homicide.

On May 12, 1994, Detectives Terrones and Sal Dominguez[1] visited businesses located in a shopping center near the crime scene. The wife of one of the proprietors they interviewed advised that Augustin Fabio Carreon ("Carreon"), the stepson of another nearby business owner, was involved in gangs and was responsible for the graffiti on the back walls of the shopping center. Terrones inspected the graffiti and discerned the alias "Gopy," which he believed to be gang-related.

---

[1] Detective Dominguez was sued initially, but was later dismissed without prejudice from this case on October 27, 2008.

2

On May 13, 1994, Terrones contacted the El Paso Police Department's gang unit to see if "Gopy" was a moniker for a known gang member. He received information that "Gory," not "Gopy," was an alias for Robert Reyes Hernandez. Upon searching the El Paso Police Department's records management system, Terrones discovered that Robert Hernandez and Plaintiff Alejandro Hernandez, who are not related, had been arrested on a prior occasion for attempting to shoplift a pair of jeans at a Mervyn's department store. Detectives Terrones and Dominguez returned to the shopping center later that day, where they were approached by Roland Echemendia, an employee of a business located there. Echemendia informed the detectives that he had witnessed Cobb's murder. There is evidence that Echemendia had spoken to detectives previously, but had not mentioned that he had witnessed the murder.

At approximately 5:30 p.m. that same day, Detectives Guillermo Martinez and Arturo Ruiz, Jr., transported Echemendia to police headquarters, where he was interviewed and provided a statement. Echemendia related that at approximately 1:30 a.m. on May 11, 1994, he was standing outside the shopping center when he observed three males standing next to a Trans-Am located outside a nearby veterinary clinic. One individual was a white male with a beard and grayish-brown hair, who was wearing a striped square pattern shirt and blue pants. Echemendia identified the second male as Carreon, whom he had known for approximately three months, although only by sight. Carreon was the stepson of one of the owners of a shop located in the shopping center. Echemendia was unable to identify the third male by name, whom he described as a Latin male in his early twenties. Echemendia had seen Carreon and the Latin male together prior to the night of Cobb's murder. Echemendia provided a physical description of the Latin male and what he was wearing.

According to Echemendia, the three men appeared to be engaged in a drug transaction. He could see that the white male had a black bag filled with

3

balloons, which he believed to contain heroin. He could hear Carreon tell the white male that he did not have money, but to give them the merchandise. Carreon then pointed to the veterinary clinic and made a gesture as if to say someone was in the clinic. The white male told the other two men to get into the Trans-Am. Carreon sat in the front seat while the Latin male sat in the back seat. There was also a young female present who did not get into the car. The Trans-Am drove off at a high rate of speed and stopped in the same area where Echemendia saw the police the next day.

A short time later, Echemendia heard "moans and groans" coming from the vicinity of the vehicle. He then saw Carreon and the Latin male running in the dark. They ran under a street light, approximately four feet from Echemendia. Echemendia heard Carreon tell the Latin male "you killed him." The Latin male then told Carreon to give him his shirt. The Latin male had blood on his shirt and on his right hand. Echemendia later identified Carreon from a single photograph, and then identified Plaintiff from a six-person photographic lineup as the Latin male who was with Carreon that night.

That same day, May 13, 1994, police brought Carreon to headquarters, where Detective Antonio Tabullo interrogated him. Carreon initially maintained his innocence. Detective Tabullo confronted Carreon with Echemendia's accusatory statement, and at approximately 7:40 p.m. on May 13, 1994, Carreon signed a statement implicating himself and another man by the nickname of "Guero" in Cobb's death. At approximately 11:10 p.m., Carreon identified Plaintiff from a single photograph as "Guero," and signed an additional statement identifying Plaintiff as his accomplice. Carreon later testified, in an affidavit submitted in connection with Plaintiff's Response to Defendants' Motion for Summary Judgment, that Detective Tabullo fabricated this confession and told Carreon that he would be released if he signed the statement. According to Carreon, Detective Ruiz placed a single picture of

4

Plaintiff in front of him and instructed him that "[t]his is Mr. Hernandez. This is 'Guero,' just sign the back of the picture and we'll let you go...."

Earlier that day, May 13, 1994, Sergeant Ocegueda had dispatched officers, including Detective Joe Zimmerly, to pick up Plaintiff as a suspect in the murder. Detectives arrived at Plaintiff's residence, where he lived with his girlfriend, Laura Cortazar, and her sisters, at approximately 5:45 p.m. When detectives first arrived, neither Plaintiff nor Cortazar were at home. Cortazar's sisters told detectives that Cortazar went to pick up Plaintiff from his place of employment. The detectives initiated surveillance on the residence. Cortazar subsequently returned without Plaintiff. She advised detectives where Plaintiff was employed, and informed them that he would arrive home on foot by 7:00 p.m. A patrol unit went to Plaintiff's employment, and discovered that it closed at 5:30 p.m.

At 9:00 p.m., Detective Zimmerly, among other officers, obtained consent from Cortazar to search Plaintiff and Cortazar's bedroom. Detective Zimmerly discovered a pair of bloodstained boxer shorts in a white grocery bag. The boxers were taken as evidence. Detective Zimmerly then interviewed Cortazar and informed her of the investigation. She stated that she and Plaintiff had been at home together on the night of May 10, 1994, and that she was not aware of Plaintiff leaving the house at any point that evening.

At 9:15 p.m., Plaintiff returned to the residence in a tan and brown van,[2] and was taken into custody by Detectives Zimmerly, Dominguez, and Martinez. At 11:30 p.m, Detective Tabullo interviewed Plaintiff, and Detective Zimmerly advised Plaintiff of the pending charges. Plaintiff told Detective Zimmerly that this was a case of mistaken identity, that he was at home on the night of May 10,

---

[2] Plaintiff's Second Amended Complaint relates that on the evening of Cobb's murder, two women heard noises coming from the desert and saw a tan van pull out of the desert and speed away.

1994, and that he did not know Carreon. Both the police reports and Plaintiff's Second Amended Complaint indicate that Plaintiff's arrest occurred after Echemendia had provided his statement and identified Plaintiff, and after Carreon had confessed that he and 'Guero' were involved in Cobb's murder. However, it appears that Plaintiff was arrested before Carreon identified Plaintiff as 'Guero'.

Also on May 13, 1994, Detective Terrones drafted a complaint affidavit to obtain a warrant for Plaintiff's arrest. It stated, in part, that:

> probable cause and the facts to support the issuance of an arrest warrant are based upon the following: ...A witness has given a statement that says that he heard the defendant and co-defendant arguing with Cobb. Cobb, the defendant, and co-defendant then got into Cobb's car and went to the desert area which is very close by. The witness heard moaning coming from the direction in which Cobb and the defendant's [sic] had gone. A short time later the defendant and co-defendant returned, on foot, to the area where the witness was and were talking about having done Cobb in.

The complaint affidavit indicated that, in addition to Echemendia's statement, it was based upon police reports and Carreon's statement that Plaintiff had stabbed Cobb with a pocket knife and struck him on the head with a metal object.

In the early morning hours of May 14, 1994, Detectives Terrones and Ruiz transported Carreon and Plaintiff to municipal court where they appeared before a magistrate judge. Plaintiff contends that while he was being transported with Carreon, Carreon recanted his identification of Plaintiff to Detectives Terrones and Ruiz. According to Plaintiff, Detective Terrones ignored Carreon, while Detective Ruiz told Carreon that he "can't change it anymore. That's something you're going to have to tell the judge." Based upon the complaint affidavit, the magistrate found probable cause existed for both Plaintiff's and Carreon's arrest and detention.

Later that day, Detectives Terrones and Zimmerly picked up Robert Hernandez as a suspect in the murder. Hernandez had been previously arrested and booked into the county jail on May 11, 1994, on outstanding felony theft warrants. Hernandez agreed to an interview with Detectives Terrones and Zimmerly, and provided an alibi for his whereabouts on the night of May 10, 1994. According to police records, during the interview Hernandez was asked if he knew Plaintiff. Hernandez stated that he knew Plaintiff, and knew him to be a violent person who was involved with drugs. In a subsequent affidavit dated October 16, 2008, which Plaintiff submitted in connection with his Response to Defendants' Motion for Summary Judgment in this case, Robert Hernandez asserted that the detectives partially fabricated the report. He also testified that he told the detectives during this May 14, 1994, interview that he "knew both [Plaintiff] and [Carreon] but [he] knew for a fact that [Plaintiff] and [Carreon] did not know each other." Assuming Hernandez did in fact make this statement, Detective Zimmerly did not include it in the police report.

After the interview with Hernandez, the detectives proceeded to Hernandez's parents' house, where his mother was able to corroborate his alibi. The detectives searched Hernandez's room, where they found a pair of shoes which tested negative for any evidence linking Hernandez to the murder. The police reports indicate that detectives also checked the clothing and shoes Hernandez wore at the time he was booked at the county jail on May 11, 1994, again with negative results.

Also on May 14, 1994, Sergeant Ocegueda received a telephone call from Dee "Baby" Stewart, who advised that a man named Brandon Hamilton had bragged to him about having committed Cobb's murder. Hamilton was located and brought to police headquarters that same day for an interview. Hamilton denied involvement in the murder, but admitted that he had spoken with Cobb a day or two prior to the murder when Cobb had tried to sell Hamilton some

items from his car. Hamilton acknowledged that he had touched some of the items in Cobb's car, as well as the outside of Cobb's car on the passenger side. Police obtained Hamilton's fingerprints, and released him without taking a statement. Two days later, police learned that Hamilton's fingerprints were a positive match with latent fingerprints, which, according to Plaintiff, were found on the car.

Police did not obtain a formal statement from Stewart until May 27, 1994. According to Stewart, he was in his apartment on the night of Cobb's murder when Hamilton, his neighbor, stopped by at approximately 2:15 a.m. Stewart observed that Hamilton was breathing hard, his shoes were covered in mud, and his hands and a small pocket knife he was carrying were covered in blood. Hamilton allegedly told Stewart that he "wasn't going to believe it, but [he] just killed somebody." Hamilton then related the details of Cobb's murder to Stewart, which Plaintiff maintains were corroborated by Cobb's autopsy and toxicology reports. According to Plaintiff, Defendants never sought permission to search Stewart's apartment for evidence that could substantiate Stewart's claims that Hamilton entered his apartment with Cobb's blood on him.

A few days later, on June 3, 1994, police arrested Hamilton on an unrelated theft charge, and Detective Dominguez obtained a formal statement detailing Hamilton's encounter with Cobb. According to Hamilton, he went to Stewart's house the following Sunday, approximately five days after Cobb's murder, with a newspaper. The two discussed the murder, which by then had been reported in the media. He again denied having committed Cobb's murder. Hamilton agreed to provide body fluid and blood samples at a later date. He was then returned to patrol officers for booking on the theft charge. Plaintiff argues that Defendants never took any additional action to search Hamilton's apartment. The police reports indicate, however, that a week later, on June 10, 1994, Detective Dominguez transported Hamilton to a medical center, where

No. 09-50659

Hamilton provided body fluid and blood samples, which were submitted for testing.

### 2.    The Criminal Trial Proceedings

An examining trial was held on May 24, 1994, to determine whether there was sufficient probable cause to turn Plaintiff's case over to the grand jury. At the outset, the magistrate judge acknowledged that, as he learned through his discussions with Plaintiff's criminal defense counsel and the prosecuting attorney, Plaintiff intended to call Carreon as a witness for the purpose of repudiating his identification of Plaintiff as a co-participant in the murder. Carreon invoked his Fifth Amendment right not to testify. Plaintiff's counsel brought the court's attention to the Sixth Amendment right to confront witnesses, as well as the portion of the complaint affidavit stating that probable cause to arrest Plaintiff was based in part on the "voluntary statement of the accused," Carreon. The magistrate judge assured Plaintiff's counsel that the prosecution was "going to have to present some other evidence" aside from the complaint affidavit, and that if the prosecution did make use of Carreon's identification of Plaintiff, then Plaintiff would have a right to confront Carreon.

In the end, Carreon's identification of Plaintiff was never introduced at the examining trial, and Carreon never testified at that proceeding. Plaintiff voluntarily testified at the hearing, and claimed that he did not know Carreon. Based upon Detective Terrones' testimony describing the crime scene and Echemendia's eyewitness testimony, the magistrate judge found that there existed sufficient probable cause to turn the case over to the grand jury. The grand jury indicted Plaintiff for Cobb's murder on June 14, 1994.

Plaintiff's criminal trial commenced on October 17, 1994. Carreon again invoked his Fifth Amendment right not to testify, and his identification of Plaintiff was never introduced at the trial. Laura Cortazar, Fernando Antonio Garinian, who was a friend of Carreon, and Plaintiff himself, all testified to the

9

effect that Plaintiff and Carreon did not know each other. Echemendia also testified at the trial consistent with the statement he had given the police. The jury convicted Plaintiff of Cobb's murder on October 19, 1994, and he was sentenced to serve ninety-nine years in prison. After serving nearly thirteen years of his sentence, Plaintiff obtained habeas corpus relief on grounds of ineffective assistance of counsel. His conviction was overturned, and all charges against him were eventually dismissed.

## B.    Procedural History

Plaintiff filed his Complaint in this case on June 20, 2008, against several El Paso police officers under 42 U.S.C. § 1983, seeking damages for violations of his Fourteenth Amendment due process rights based upon his allegedly wrongful arrest, prosecution, and conviction. Plaintiff also asserted claims for conspiracy under both state law and 42 U.S.C. § 1985, as well as a § 1983 claim against the City of El Paso. Plaintiff's specific § 1983 claims against the individual Defendants, Detectives Jesus Terrones, Guillermo Martinez, Arturo Ruiz, Jr., Antonio Tabullo, Joe Zimmerly, and Sergeant Pedro Ocegueda, were ones for false arrest, malicious prosecution, illegal detention, and wrongful conviction, and for constitutional violations under *Brady v. Maryland*, 373 U.S. 83 (1963).

Plaintiff argued that Defendants violated his procedural due process rights by manipulating identification evidence, conducting impermissibly suggestive identification procedures, manipulating the outcome of the murder investigation, deliberately failing to investigate, concealing and intentionally failing to recover and develop materially exculpatory information and evidence, making a false determination of probable cause, and manipulating eyewitness identification evidence by use of threats and coercion. Defendants moved for summary judgment, on grounds that Plaintiff was judicially estopped from asserting his claims, that his Fourteenth Amendment due process claims were time-barred, that Defendants were otherwise entitled to qualified immunity on Plaintiff's §

1983 claims, and that Plaintiff had failed to adduce sufficient evidence in support of his conspiracy claims.

The district court classified Plaintiff's claims as ones for employing impermissibly suggestive identifications, conducting a reckless investigation, and violating Plaintiff's rights under *Brady*. The district court concluded that these claims were not time-barred, and that Plaintiff was not judicially estopped from asserting them. The district court denied qualified immunity to the individual Defendants on Plaintiff's reckless investigation claim, on grounds that Plaintiff had adduced evidence creating fact questions that Defendants had "hectored" Carreon into identifying Plaintiff as his accomplice, and later ignored Carreon's recantation of that identification. The district court found that Plaintiff stated a constitutional deprivation based upon an allegedly unduly suggestive identification procedure employed with Carreon, but granted qualified immunity on Plaintiff's claim of impermissibly suggestive identification as it related to the procedure used in connection with Echemendia's identification of Plaintiff. The district court further denied qualified immunity on Plaintiff's claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), concluding that Defendants had failed to disclose exculpatory evidence. The district court grounded its denial of qualified immunity on the presence of material disputes of fact as to Plaintiff's allegations on these claims. The district court dismissed Plaintiff's § 1985 and state law conspiracy claims.

Defendants now take an interlocutory appeal, arguing that Plaintiff's due process claims are time-barred, and that they are otherwise entitled to qualified immunity on Plaintiff's remaining § 1983 claims for constitutional violations associated with: (1) the alleged reckless investigation conducted by Defendants based upon their "hectoring" Carreon into identifying Plaintiff as an accomplice, failing to record Robert Hernandez's statement that Plaintiff and Carreon did not know each other, and failing to investigate Hamilton as a potential suspect;

11

(2) the alleged unduly suggestive identification procedure used with Carreon in his identification of Plaintiff as an accomplice; and (3) the alleged *Brady* claims pertaining to the non-disclosure of Robert Hernandez's statement, the "hectoring" of Carreon into confessing and identifying Plaintiff as an accomplice, and Carreon's recantation of that identification.

## II.  JURISDICTION AND STANDARD OF REVIEW

### A.    Jurisdiction

"District court orders denying summary judgment on the basis of qualified immunity are immediately appealable under the collateral order doctrine, notwithstanding their interlocutory character, when based on a conclusion of law." *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 531 (5th Cir. 1997) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).  "[W]e are restricted to determinations of questions of law and legal issues, and we do not consider the correctness of the plaintiff's version of the facts."  *Id.* (quoting *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 251-52 (5th Cir. 2005)).  We review only "whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004); *see also Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007) ("In other words, we may only review the district court's conclusion that issues of fact are material (a legal question), but we may not review the conclusion that those issues of fact are genuine (a fact question).").  "Where factual disputes exist in an interlocutory appeal asserting qualified immunity, we accept the plaintiffs' version of the facts as true." *Kinney*, 367 F.3d at 348.

### B.    Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure states that the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also Meyers v. M/V Eugenio C.*, 842 F.2d 815, 816 (5th Cir. 1988).

The mere existence of a disputed factual issue does not foreclose summary judgment. "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004) (quoting *Hanchey v. Energas Co.*, 925 F.2d 96, 97 (5th Cir. 1990)). "With regard to 'materiality,' only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir. 1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . . all other contested issues of fact are rendered immaterial." *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1987).

## III. ANALYSIS

### A.  Defendants' Statute of Limitations Defense

Defendants argue that the district court erred in determining that Plaintiff's Fourteenth Amendment due process claims were not barred by the statute of limitations. Defendants' theory is that these claims are related to false arrest claims under the Fourth Amendment, which are subject to a two year statute of limitations commencing at the time a claimant becomes detained pursuant to legal process. In *Mitchell v. Forsyth,* 472 U.S. 511, 530 (1985), the Supreme Court held that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final

decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Enlow v. Tishomingo Cnty., Miss.*, 962 F.2d 501, 508 (5th Cir. 1992). However, "[t]he Supreme Court has been reluctant to endorse the exercise of pendent appellate jurisdiction over rulings that, while being related to the denial of qualified immunity, are not themselves independently appealable prior to judgment." *Cantu v. Rocha*, 77 F.3d 795, 805 (5th Cir. 1996) (citation omitted). Because the denial of a statute of limitations defense is not immediately appealable, this Court may consider it only if it exercises pendent jurisdiction. *Aldy on Behalf of Aldy v. Valmet Paper Machinery*, 74 F.3d 72, 75 (5th Cir. 1996) ("the denial of summary judgment on the grounds of a statute of limitations is neither a final order. . .nor does it fit within that small category of claims subject to immediate appeal. . .").

"Pendant [sic] appellate jurisdiction is only proper in rare and unique circumstances where a final appealable order is 'inextricably intertwined' with an unappealable order or where review of the unappealable order is necessary to ensure meaningful review of the appealable order." *Thornton v. Gen. Motors Corp.*, 136 F.3d 450, 453 (5th Cir. 1998). Although we did so in an unpublished opinion, we have determined on at least one occasion that a statute of limitations defense is not "inextricably intertwined" with the denial of qualified immunity, so as to give rise to pendent appellate jurisdiction. *Jackson v. Mitchell*, 54 Fed. App'x 794, at *1 (5th Cir. 2002). Other circuits have reached the same conclusion. *See Bryson v. Gonzales*, 534 F.3d 1282, 1285-86 (10th Cir. 2008) (finding that "timeliness issues" were not "'inextricably intertwined' with the qualified immunity issue nor necessary to 'meaningfully review' it."); *Triad Assoc., Inc. v. Robinson*, 10 F.3d 492, 497 n.2 (7th Cir. 1993) ("[W]e do not find that these collateral issues are 'inextricably entwined' with the appealable qualified immunity inquiry nor that there are 'compelling reasons' for not

14

deferring the limitations questions until the end of the lawsuit that would justify our invoking our rarely appropriate pendent appellate jurisdiction.").

Based on the foregoing, we conclude that we lack jurisdiction over the district court's denial of summary judgment on the statute of limitations defense, and do not reach the merits of this claim.

**B.    Plaintiff's Individual Capacity § 1983 Claims**

### 1.    42 U.S.C. § 1983 and Qualified Immunity

42 U.S.C. § 1983 imposes liability upon any person who, acting under color of state law, deprives another of federally protected rights.  42 U.S.C. § 1983. Section 1983 affords a remedy to those who suffer, as a result of state action, deprivation of rights, privileges, or immunities secured by the Constitution and the laws of the United States. *White v. Thomas*, 660 F.2d 680, 683 (5th Cir. 1981).  A plaintiff cannot succeed on a § 1983 claim merely by showing any deprivation of his rights; § 1983 was intended to preserve rights protected by federal law. *Wright v. Collins*, 766 F.2d 841, 849 (5th Cir. 1985).

"Qualified immunity balances two important interests– the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, - - U.S - - , 129 S. Ct. 808, 815 (2009).  "When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002) (citing *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001)).  This burden cannot be discharged by conclusory allegations and assertions. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005).

Evaluating a claim of qualified immunity involves two inquiries: (1) whether the plaintiff has alleged a violation of a constitutional right; and (2) whether that right was clearly established at the time of the alleged misconduct.

*Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson*, 129 S. Ct. 808. "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009) (citations omitted). A defendant will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the defendant's actions were lawful; but if officers of reasonable competence could disagree on the issue, immunity should be recognized. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). It is within the discretion of the district court to decide which of the two prongs of the qualified immunity analysis to address first in light of the circumstances of each case. *Pearson*, 129 S. Ct. at 818. Each defendant's actions must be evaluated individually in the qualified immunity context.[3] *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007).

"The scope of clearly established law and the objective reasonableness of those acts of the defendant that the district court found the plaintiff could prove at trial are legal issues we review *de novo*." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 456 (5th Cir. 2001). Where, however, the district court denies a motion for summary judgment on the basis of qualified immunity simply because "fact issues" remain, this Court may "either scour the record and determine what facts the plaintiff may be able to prove at trial and proceed to resolve the legal issues, or remand so that the trial court can clarify the order." *Id*.

---

[3] Although courts ought to analyze each defendant's actions separately to determine the entitlement to qualified immunity of each, we find it unnecessary to do so in this case because of our conclusion that none of Plaintiff's claims are legally cognizable or raise a genuine, material fact issue which could disentitle any of Defendants, whatever their precise involvement in the investigation, from qualified immunity.

## 2.    Defendants are Entitled to Qualified Immunity on Plaintiff's Fourteenth Amendment Claim for Conducting a Reckless Investigation

The district court denied qualified immunity on this claim, reasoning that an official may be exposed to liability under § 1983 if he deliberately ignores exonerative evidence or conducts a reckless investigation. Because Plaintiff had adduced evidence that, if accepted as true, would establish that Carreon was pressured into implicating Plaintiff as his accomplice, and because there was evidence that Defendants ignored Carreon's recantation of his identification of Plaintiff, the district court concluded that, resolving all factual disputes in Plaintiff's favor, he had stated a cognizable claim for a violation of his rights based on a reckless investigation. At oral argument, the parties disputed whether there exists in this Circuit a clearly established constitutional right to be free from a reckless investigation.

To determine whether a specific claim states the violation of a constitutional right, we have held that "[s]uch claims of lost constitutional rights are for violation of rights locatable in constitutional text, and some such claims may be made under 42 U.S.C. § 1983." *Castellano v. Fragozo*, 352 F.3d 939, 953-54 (5th Cir. 2003) (en banc) (finding no freestanding constitutional right to be free from malicious prosecution). In *Sanders v. English*, 950 F.2d 1152 (5th Cir. 1992), we recognized that police officers may be liable for illegal detention under § 1983 for deliberately ignoring exonerative evidence or conducting a reckless investigation. *Sanders*, 950 F.2d at 1162. *Sanders* did not recognize an independent constitutional claim for being subjected to a reckless investigation; instead, it acknowledged that conducting a reckless investigation could support other claims for violations of established constitutional rights. In that case, we reversed the grant of summary judgment

17

to the defendant officer on plaintiff's claim for illegal detention, not reckless investigation. We explained that:

> the plaintiff ha[d] come forward with evidence which, if credited by the fact-finder, would establish that the defendant knowingly and willfully ignored substantial exculpatory evidence. A fact-finder reasonably could conclude that Lt. McCoy deliberately looked the other way in the face of exonerative evidence indicating that he had arrested the wrong man: three alibi witnesses deemed credible by Lt. McCoy, a negative identification by one of the witnesses who helped compose the police sketch, and a belated identification by the victim under peculiar circumstances. Lt. McCoy's deliberate failure to disclose this undeniably credible and patently exculpatory evidence to the prosecuting attorney's office plainly exposes him to liability under § 1983.

*Id*. at 1162 (citing *Geter v. Fortenberry*, 882 F.2d 167 (5th Cir. 1989) (*Geter II*)). We found that, under the circumstances, "a jury could find that if Lt. McCoy had disclosed the exculpatory evidence to the prosecuting attorney's office, Sanders would have been released and the charges against him dropped long before they were." *Id*. This supported Sanders' claim, which was one for illegal detention, not reckless investigation. *See id*.

Plaintiff urges that the facts of this case are akin to those in *Sanders*, such that Defendants are not entitled to qualified immunity. He contends in his supplemental brief that "[w]hile *Sanders* described liability for conducting a reckless investigation under the rubric of 'illegal detention,' this is a distinction without a difference. Labels do not control." Indeed, the plaintiff in *Sanders* classified one of his causes of action as one for negligent investigation. *Id*. at 1158 n.10.

This Court instead characterized Sanders' claim, based on the facts alleged in the Complaint and those adduced during discovery, as being "not merely one for *negligent* investigation leading up to the arrest; the claim is also one for illegal detention based on the officers' *deliberate* failure to recognize,

investigate, and disclose patently exonerative evidence which surfaced immediately following the arrest." *Id.* (emphasis in original). We did not hold that the negligent investigation and ignoring of exculpatory evidence in *Sanders* were freestanding constitutional violations, rather, they were conduct supporting Sanders' claims for false arrest and illegal detention. In sum, we conclude that there was no freestanding, clearly established constitutional right to be free from a reckless investigation at the time of the events alleged in the Complaint.

Even if we re-characterize this claim as one cognizable under § 1983, such as for false arrest[4] or illegal detention (the rights at issue in *Sanders*), we cannot reach the same conclusion *Sanders* did under the facts of this case, even resolving those facts in Plaintiff's favor. In *Sanders*, we "beg[a]n by observing that our circuit recognizes causes of action under § 1983 for false arrest, illegal detention (false imprisonment) and malicious prosecution."[5] *Id.* at 1159. "These causes of action implicate the constitutional 'guarantees of the fourth and

---

[4] We assume for purposes of this appeal that any false arrest claim would not be time-barred.

[5] In *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) (en banc), we later concluded that "no such freestanding constitutional right to be free from malicious prosecution exists." *Id.* at 945. We held that "causing [criminal] charges to be filed without probable cause will not without more violate the Constitution." *Id.* at 953. However, we noted that "additional government acts that may attend the initiation of a criminal charge could give rise to claims of constitutional deprivation." *Id.*

> The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection–the Fourth Amendment if the accused is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued. Such claims of lost constitutional rights are for violation of rights locatable in constitutional text, and some such claims may be made under 42 U.S.C. § 1983. Regardless, they are not claims for malicious prosecution and labeling them as such only invites confusion.

*Id.* at 953-54; *see also Deville v. Marcantel*, 567 F.3d 156, 169 (5th Cir. 2009) (citing *Castellano* and holding that a malicious prosecution claim is not independently cognizable under § 1983).

fourteenth amendments when the individual complains of an arrest, detention, and prosecution *without probable cause.*'" *Id.* (emphasis added) (quoting *Thomas v. Kippermann*, 846 F.2d 1009, 1011 (5th Cir. 1988)).

In the context of evaluating the existence of probable cause and whether an officer is entitled qualified immunity, "we embark on a 'practical, common-sense [determination] whether given all of the circumstances' a reasonable officer could have believed 'there is a fair probability' [Plaintiff] committed the crime charged." *Mendenhall v. Riser*, 213 F.3d 226, 231 (5th Cir. 2000) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). In considering the totality of the circumstances, we disregard any false statements in the affidavit supporting the warrant which are made knowingly and intentionally, or with reckless disregard for the truth, and consider omissions that may have been critical to a determination of probable cause. *Hale v. Fish*, 899 F.2d 390, 400 & n.3 (5th Cir. 1990) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).

Based upon the facts of this case, and construing them in Plaintiff's favor, Plaintiff is unable to establish a § 1983 claim for false arrest or illegal detention. The district court denied qualified immunity on the "reckless investigation" allegation, on the grounds that there was evidence that Defendants coerced Carreon into identifying Plaintiff, and then ignored Carreon's recantation of that identification. In *Mundy v. State of Georgia*, 586 F.2d 507 (5th Cir. 1978) (per curiam), we held that impermissibly suggestive identifications which are used in conjunction with other evidence cannot form the basis of a § 1983 claim against an officer, where there was ample probable cause to swear out a warrant for the defendant's arrest. *See id.* at 508. Detective Terrones' complaint affidavit relied on police reports, a witness statement (Echemendia), as well as a voluntary statement of the accused (Carreon). Unlike *Sanders*, it cannot be said that evidence that Carreon was pressured into identifying Plaintiff, if made known at the time of the issuance

of the arrest warrant or later disclosed to the district attorney, would have established that there remained no probable cause for Plaintiff's arrest, detention, or prosecution, such that he would have been released. Leaving aside any misconduct which occurred with respect to Carreon's identification of Plaintiff and his later recantation, the record is clear that the magistrate at Plaintiff's examining trial was satisfied that Echemendia's identification testimony provided a separate and sufficient basis to support a finding of probable cause.[6] Echemendia provided the only identification testimony at the examining trial, at which Carreon did not testify.

The record further reflects that both the district attorney and defense counsel were aware of Carreon's recantation of Plaintiff's identification prior to Plaintiff's examining trial on May 24, 1994. Because this information was disclosed, this case is even more dissimilar from *Sanders*, and Plaintiff cannot support a false arrest or illegal detention claim based on this evidence. And unlike *Sanders*, in which the grand jury refused to indict, Plaintiff here was indicted.

Plaintiff maintains, and the district court found, however, that had Defendants "disclos[ed] [Robert] Hernandez's complete statement, then the value of Echemendia's eyewitness testimony would have been substantially reduced, if not obliterated." We must also consider omissions which may have been critical to a determination of probable cause.

First, we note that Robert Hernandez's statement was not obtained until after Detective Terrones had completed the complaint affidavit to support an arrest warrant. It was obtained before Plaintiff's examining trial occurred. Though Robert Hernandez's statement might have contradicted Echemendia's

---

[6] The district court determined that the identification procedures used with Echemendia, the eyewitness, did not violate the Constitution, and granted qualified immunity as to this claim.

testimony, it did not eliminate it.   Moreover, this purportedly exonerative evidence pales in comparison to that present in *Sanders*, where the defendant officer failed to disclose: (1) that the identifying victim was related to Sanders, yet was unable to name Sanders as the assailant until he saw him in a packed courtroom; (2) a negative identification by a witness who helped to compose the sketch of the robber; and (3) the existence of three credible alibi witnesses, one of whom was a former police officer.   Under the circumstances of this case, a reasonable officer or magistrate could have believed that there was a fair probability Plaintiff committed the crime charged, even taking Robert Hernandez's statement into account.

Plaintiff's contention that qualified immunity should be denied on grounds that Defendants failed to thoroughly investigate Hamilton as a potential suspect is similarly unavailing.   The record reflects that the investigation file, which included both Hamilton's and Stewart's statements, was turned over to the district attorney.   It is undisputed that the prosecution maintained an open file policy, such that this information was available to Plaintiff's criminal defense attorney.   Plaintiff cannot argue that the case against him would have been dismissed any sooner on grounds that the prosecuting attorney was unaware of this potential suspect.   Whatever flaws there may have been in Defendants' handling of Hamilton as a potential suspect, these were disclosed to Plaintiff prior to trial, and they did not alter Echemendia's identification. Under these facts, there was probable cause to both arrest and detain Plaintiff.   We cannot say that no objectively reasonable officer would have concluded that probable cause did not exist.

In sum, "reckless investigation" was not a clearly established stand alone constitutional violation at the time of the events in question.   Any reliance on *Sanders* for this proposition is misplaced.   *Sanders* held that *evidence* of a reckless investigation could support cognizable constitutional claims, such as

ones for false arrest or illegal detention, under § 1983. Even if we re-characterize Plaintiff's "reckless investigation" claim as one for illegal detention, or for some other cognizable constitutional violation, such as false arrest, because the exonerative evidence at issue would not have eliminated "the only thread of evidence tying [Plaintiff] to the crime," *Sanders*, 950 F.2d at 1164, and because the incriminating evidence which remained was sufficient to support the existence of probable cause, Plaintiff cannot demonstrate the violation of his constitutional right to be free from false arrest or illegal detention. Based on the foregoing, and because there was no clearly established constitutional right to be free from a reckless investigation at the time of the events in question, Defendants are entitled to qualified immunity on this claim.

### 3.    Defendants are Entitled to Qualified Immunity on Plaintiff's Fourteenth Amendment Claim for Suggestive Identification

The Second Amended Complaint alleges that Defendants violated Plaintiff's Fourteenth Amendment due process rights by "[m]anipulating identification evidence and conducting irreparably harmful and impermissibly suggestive identification procedures later presented as evidence against, and used to convict, the innocent Plaintiff." The district court denied qualified immunity on this claim, finding that material fact questions existed as to whether an unduly suggestive identification procedure was used to induce Carreon to identify Plaintiff. Defendants argue that the district court erred on grounds that there can be no Fourteenth Amendment due process violation where the alleged unduly suggestive identification was not used at trial, and where there existed an independent basis for a finding of probable cause in the complaint affidavit, as well as at the examining trial.

The United States Supreme Court has held that the determination as to whether a defendant's Fourteenth Amendment due process rights are violated

by the admission of evidence at trial derived from unnecessarily suggestive identification procedures depends upon the totality of the circumstances surrounding those procedures. *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314 (1987). In *Manson v. Brathwaite*, 432 U.S. 98 (1977), the Supreme Court described the standard under the Due Process Clause as one of fairness, and identified the interest protected in *Stovall* as evidentiary. *Manson*, 432 U.S. at 113. The Court noted that "a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest," *id*. at 113 n.13, and held that "reliability is the linchpin" in determining the admissibility of such identification testimony, *id*. at 114. In assessing the reliability of an identification and evaluating whether there exists a high likelihood of misidentification, a number of factors should be considered.[7] *Id*. (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)). This analysis is in turn determinative of whether the evidence should be permitted to go to the jury. *See Biggers*, 409 U.S. at 201. Both *Stovall* and *Manson* reflect "the concern that the *jury* not hear eyewitness testimony unless that evidence has aspects of reliability." *Manson*, 432 U.S. at 112 (emphasis added).

Several circuits have interpreted *Stovall* and *Manson* to mean that, in the context of unduly suggestive lineups, no due process violation occurs unless a defendant's right to a fair trial is impaired. *See Pace v. City of Des Moines*, 201 F.3d 1050, 1055 (8th Cir. 2000); *Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987); *Antonio v. Moore*, 174 Fed. App'x 131, 135-36 (4th Cir. 2006). In *Hensley,* the Seventh Circuit concluded that *Stovall* and *Manson*, "establish procedural

---

[7] These factors "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson*, 432 U.S. at 114.

safeguards to insure that only reliable identification evidence is admitted at trial. *Stovall* and [*Manson*] do not establish a right to an impartial lineup as long as the evidence gained through that lineup is not used at trial." *Hensley*, 818 F.2d at 650. *Hensley* held that "[t]he rule against admission of evidence from unnecessarily suggestive lineups is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of the core right and not the prophylactic rule that should be actionable under § 1983." *Id*. at 649; *see also Pace*, 201 F.3d at 1055 ("The jurisprudential doctrine described in *Manson*..., against the admission of unduly suggestive lineups is only a procedural safeguard, and does not establish a constitutional right to be free of suggestive lineups."). We find this reasoning persuasive.

Plaintiff relies on *Geter v. Fortenberry*, 882 F.2d 167 (5th Cir. 1989) (*Geter II*), which found that police employed unduly suggestive identification procedures where they "insist[ed] that [witnesses] pick an individual from photo lineups, prodd[ed] the witnesses to select another picture when they had chosen incorrectly, and bec[ame] hostile. . .when a witness refused to cooperate." *Geter*, 882 F.2d at 170. Relying on *Geter II*, this Court recently concluded in *Good v. Curtis*, 601 F.3d 393 (5th Cir. 2010), that "a police officer's knowing efforts to secure a false identification by fabricating evidence or otherwise unlawfully influencing witnesses is not entitled to qualified immunity." *Good*, 601 F.3d at 398.

In *Good*, we also concluded that "[a] plaintiff need not undertake the impossible task of satisfying the [*Manson*] test where an officer's intentional conduct was designed to artificially produce precisely the sort of witness certainty that otherwise justifies the *admission* of suggestive lineups and the criminal defendant has been exonerated in the meantime." *Id*. at p. 401 (emphasis added). In *Good*, the officer deliberately framed the plaintiff for a crime he clearly had not committed, as DNA evidence conclusively established

No. 09-50659

that the defendant was not guilty of the crime of which he had been convicted. *Id.* at 397, 398. Based upon this conclusive exonerative evidence, any positive identification of the defendant had to be incorrect. Thus, there was no need to determine whether the lineup suffered from a high "likelihood of misidentification," as required by *Manson*. *Id.* at 399.

However, it is clear from both *Geter II* and *Good*, that the improperly procured identifications at issue were introduced at the respective plaintiffs' criminal trials in both cases. Such is not the situation here. *Geter II* and *Good* are thus factually distinguishable from the present dispute in this important respect. We do not read either *Geter II* or *Good* as eroding the notion that, in order for there to be a due process violation in the context of an unduly suggestive identification procedure, the defendant's right to a fair trial must be impaired.

Turning to the case at bar, it is undisputed that Carreon invoked his Fifth Amendment right against self-incrimination, and refused to testify at both Plaintiff's examining trial and trial. His identification of Plaintiff was not the sole basis for the probable cause determination in seeking Plaintiff's arrest and detention. It was never introduced at either the examining trial or trial, and did not serve as the basis for his continued detention or eventual conviction at trial. Plaintiff's due process rights were therefore not violated, whether Carreon's pretrial identification of Plaintiff was either unduly suggestive or intentionally manipulated, as the identification was not "clearly critical" to the probable cause determination supporting Plaintiff's arrest and detention, nor was it ever admitted into evidence at trial.

In 1994, no violation of a clearly established constitutional right occurred where a defendant was afforded a fair trial not impaired by the admission of evidence derived from an unduly suggestive identification procedure. Defendants are entitled to qualified immunity on this claim.

26

4.   **Defendants are Entitled to Qualified Immunity on Plaintiff's Fourteenth Amendment Claim for Withholding Exculpatory Evidence in Violation of *Brady v. Maryland*, 373 U.S. 83 (1963)**

Defendants appeal the district court's determination that Defendants "cannot avail themselves of qualified immunity because they failed to disclose *Brady* exculpatory evidence relating to (1) the lack of association between Carreon and Plaintiff, (2) the collusive origin of Carreon's confession and identification, and (3) Carreon's presumed recantation."

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government must disclose material, exculpatory evidence to a criminal defendant. *United States v. Walters,* 351 F.3d 159, 169 (5th Cir. 2003) (citing *Brady*, 373 U.S. at 87). "A valid *Brady* complaint contains three elements: (1) the prosecution must suppress or withhold evidence, (2) which is favorable, and (3) material to the defense." *United States v. Lanford*, 838 F.2d 1351, 1355 (5th Cir. 1988) (quoting *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980)). Impeachment as well as exculpatory evidence fall within *Brady*'s purview. *United States v. Bagley*, 473 U.S. 667, 676 (1985).

"Evidence is not 'suppressed' if the defendant 'knows or should know of the essential facts that would enable him to take advantage of it.'" *United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002) (citing *United States v. Shoher*, 555 F. Supp. 346, 352 (S.D.N.Y. 1983)); *see also United States v. Brown*, 628 F.2d 471, 473 (5th Cir. 1980) ("[W]hen information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* claim."). With respect to "materiality," "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable

probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. "The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." *Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990), *vacated*, 503 U.S. 930 (1992), *abrogated on other grounds*, *Stringer v. Black*, 503 U.S. 222 (1992).

Defendants argue that in 1994, *Brady* did not extend to police officers. They cite *Mowbray v. Cameron Cnty.*, 274 F.3d 269 (5th Cir. 2001), in support of their position. In *Mowbray*, officers failed to provide exculpatory evidence to the defendant's counsel. Although this Court observed that "our research reveals, no case extending *Brady* to police officers...," we also stated that "Mowbray does not allege, nor do the facts support a finding, that [the officers] elicited false evidence and deliberately concealed exculpatory evidence from all parties, including the prosecution." *Mowbray* then cited *Geter v. Fortenberry*, 849 F.2d 1550 (5th Cir. 1988) (*Geter I*), which in turn cited *Brady*, and held "that a police officer cannot avail himself of a qualified immunity defense if he. . .deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional rights." *Geter*, 849 F.2d at 1559. Based on the foregoing, it was clearly established law in 1994 that *Brady* applied to police officers on facts such as those presented in this case. We now turn to each of Plaintiff's alleged *Brady* violations.

a.    *The Lack of Association Between Carreon and Plaintiff*

The district court denied qualified immunity on this point on the basis that there was a question of fact as to whether Robert Hernandez had provided Detectives Terrones and Zimmerly with a statement that Plaintiff and Carreon did not know each other, which Zimmerly did not memorialize in his report. In determining that Hernandez's statement was material, the district court noted that "[s]ince there was no physical evidence linking Plaintiff to Cobb's murder,

the entire criminal case against Plaintiff mainly consisted of Echemendia's eyewitness account." It stated that,

> if Defendants had disclosed Hernandez's statement that Plantiff and Carreon had never met, then Echemendia's eyewitness statement implicating both to Cobb's murder would have been undermined. Moreover, the demise of Echemendia as a credible prosecution witness would have done more than just nullify his testimony; it would also have served to discredit generally the police methods employed in assembling the case against Plaintiff, calling into question the veracity of testimony of other prosecution witnesses.

*Hernandez v. City of El Paso*, 662 F. Supp. 2d 596, 619 (W.D. Tex. 2009). Defendants argue on appeal that "Terrones and Zimmerly did not conceal evidence that Alejandro Hernandez and Augustine Carreon did not know each other because Juan Fernandez, [sic] Antonio Garinian, Laura Cortazar and Alejandro Hernandez all testified to that fact at the murder trial of Alejandro Hernandez." Essentially, Defendants' argument is that Robert Hernandez's testimony was cumulative, such that its non-disclosure did not violate *Brady*. Unfortunately, the district court was deprived of the opportunity to address the question of whether Robert Hernandez's testimony was cumulative because Defendants never raised the issue below. Despite Defendants' failure to properly place this issue before the district court, because our review is *de novo* we will address it here.

The failure to disclose evidence which is cumulative does not present a *Brady* violation. *Allridge v. Scott*, 41 F.3d 213, 218 (5th Cir. 1994). Here, Fernando Antonio Garinian testified at Plaintiff's trial that he and Carreon were friends, but that he had never seen Plaintiff before. Laura Cortazar, Plaintiff's girlfriend, testified that she did not know Carreon and had only heard of him in connection with this case. Plaintiff himself testified that he did not know Carreon.

No. 09-50659

By affidavit, Robert Hernandez testified in this case that he "told the detective that ... I knew both [Plaintiff] and [Carreon] but I knew for a fact that [Plaintiff] and [Carreon] did not know each other." This statement is largely cumulative of the testimony presented at the criminal trial. *See Andrews v. Collins*, 21 F.3d 612, 626 & n.29 (5th Cir. 1994) (testimony that is, in the main, cumulative is not material for purposes of *Brady*); *see also Edmond v. Collins*, 8 F.3d 290, 294 (5th Cir. 1993). If this statement could have lent any value to Plaintiff's defense, it was at most incremental. Incremental impeachment value of suppressed evidence, however, does not raise a reasonable probability of a different result at trial. *See Drew v. Collins*, 964 F.2d 411, 419-20 (5th Cir. 1992); *see also Miller v. Dretke*, 431 F.3d 241, 251 (5th Cir. 2005). Because Plaintiff and two other witnesses did testify at the trial as to the lack of association between Carreon and Plaintiff, we cannot say that Robert Hernandez's testimony raises a reasonable probability of a different result at Plaintiff's trial.

We are not persuaded that *Lindsey v. King*, 769 F.2d 1034 (5th Cir. 1985), which was cited below, changes the result. In *Lindsey*, the plaintiff appealed the denial of his petition for a writ of habeas corpus, alleging a *Brady* violation in connection with his underlying criminal trial. There, the prosecutor failed to disclose a statement made by an eyewitness shortly after the murder that he did not see the perpetrator's face, and would therefore be unable to make a positive identification. We concluded that the non-disclosed statement would have "cast serious doubt" on the testimony of that eyewitness, who made a positive identification of the plaintiff at his criminal trial. Though the testimony of a second eyewitness remained untouched by the statement, we found a *Brady* violation. We concluded that:

> our experience at the bar has been that positive identification by
> two unshaken witnesses possesses many times the power of such an

30

identification by one only, and that the destruction by cross-examination of the credibility of one of two crucial witnesses–even if the other remains untouched–may have consequences for the case extending far beyond the discrediting of his own testimony.

*Lindsey*, 769 F.2d at 1042. Unlike Robert Hernandez's statement here, the non-disclosed statement at issue in *Lindsey* was not cumulative of other evidence. Finally, although not dispositive of this issue, we note that Plaintiff's criminal defense counsel knew or should have been aware of Robert Hernandez's identity prior to the trial based on the district attorney's open file policy. Robert Hernandez was not called to testify as a witness by either side. The record is silent on what attempts, if any, Plaintiff's defense counsel made to interview Robert Hernandez prior to trial. In any case, at a minimum, his identity as a potential witness was, or should have been, known to Plaintiff.

In sum, we conclude that no *Brady* violation occurred with regard to the alleged non-disclosure of Hernandez's cumulative statement.

### b.    *The Collusive Origin of Carreon's Confession and Identification*

The district court concluded that non-disclosure of the alleged collusive origin of Carreon's confession and identification presented fact questions as to whether there was a *Brady* violation. Plaintiff argues that Defendants have not briefed the issue, and have therefore waived it on appeal. Defendants have, however, argued that the district court erroneously denied summary judgment on Plaintiff's *Brady* claim. Where the district court denies a motion for summary judgment on the basis of qualified immunity because "fact issues" remain, this Court may "either scour the record and determine what facts the plaintiff may be able to prove at trial and proceed to resolve the legal issues, or remand so that the trial court can clarify the order." *Thompson v. Upshur County, TX*, 245 F.3d 447, 456 (5th Cir. 2001). In the interest of judicial economy, we elect to "scour the record" and address this claim.

31

Accepting Plaintiff's version of the facts as true, the record reflects that Carreon was strong-armed into identifying Plaintiff as his accomplice. Even if this information was suppressed, we do not see how its disclosure could have impacted the result of the criminal proceeding, since it is undisputed that Carreon did not testify at either Plaintiff's examining trial or his trial, and that Carreon's identification of Plaintiff was never introduced at either proceeding. In his supplemental brief filed after oral argument, Plaintiff argues that this evidence is material on grounds that it served as the basis for his conviction. He maintains that the only reason his photograph was included in the six-person photo array shown to Echemendia was because Carreon had been earlier coerced into identifying him as an accomplice. Thus, had he "known about the misconduct surrounding Carreon's identification, Echemendia would have had no credibility as a witness." We are not persuaded by this reasoning.

Plaintiff does not argue that Echemendia was coerced into identifying Plaintiff, but instead argues that his picture would not have been included in the six-person photo array presented to Echemendia had the misconduct surrounding Carreon's identification not occurred. Accepting Plaintiff's version of the facts as true, any misconduct in selecting Plaintiff's photograph for inclusion in the photo array is insulated by Echemendia's independent identification of Plaintiff from the lineup, and does not raise a reasonable probability of a different outcome at trial.

Moreover, the district court concluded that the six-person photographic lineup shown to Echemendia was not impermissibly suggestive, and granted qualified immunity on this claim. *Hernandez*, 662 F. Supp. 2d at 611-12. Thus, the constitutionality of the identification procedures employed in Echemendia's identification of Plaintiff are not before us on this appeal, and this Court lacks jurisdiction to consider them.

In sum, no *Brady* violation occurred with respect to this evidence.

*c.    Carreon's Recantation*

The district court found that the alleged non-disclosure of Carreon's recantation of his identification of Plaintiff as his accomplice to Detectives Terrones and Ruiz would violate *Brady*.  The record reflects, however, that Plaintiff was present and overheard Carreon's recantation at the time it was made.  It is also clear that Plaintiff's criminal defense counsel knew of the presumed recantation before his trial in October 1994, and at least as early as May 24, 1994, the date of Plaintiff's examining trial.

"*Brady* claims involve 'the discovery, *after* trial of information which had been known to the prosecution but unknown to the defense.'"  *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994) (emphasis added); *see also United States v. Fogg*, 652 F.2d 551, 558 (5th Cir. 1981).  In *United States v. Brown*, 628 F.2d 471 (5th Cir. 1980), this Court stated:

> regardless of whether the evidence was material or even exculpatory, when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of diligence, the defendant has no *Brady* claim....In no way can information known and available to the defendant be said to have been suppressed by the Government.

*Id*. at 473.  Based on the facts of this case, and the law as it existed in 1994, there was no *Brady* violation with respect to the alleged suppression of this evidence, as Plaintiff and his counsel were clearly aware of Carreon's recantation prior to trial.  Moreover, because Carreon did not testify at Plaintiff's trial, and because Carreon's identification of Plaintiff was never introduced, we do not see how disclosure of Carreon's recantation of his identification of Plaintiff could have impacted the result of the criminal proceeding in any significant way.

Resolving all factual disputes in Plaintiff's favor, he has not shown the violation of a clearly established constitutional right on his *Brady* claim. Defendants are therefore entitled to qualified immunity.

## IV.  CONCLUSION

We decline to exercise pendent jurisdiction over the district court's denial of summary judgment on the statute of limitations issue.  Plaintiff has not established the violation of any clearly established constitutional rights on his individual capacity § 1983 claims as the law existed in 1994.  Defendants Jesus Terrones, Guillermo Martinez, Arturo Ruiz, Jr., Antonio Tabullo, Joe Zimmerly, and Pedro Ocegueda, are therefore entitled to qualified immunity on Plaintiff's remaining individual capacity § 1983 claims against them.  Accordingly, we REVERSE the district court's denial of qualified immunity, and REMAND for entry of summary judgment in Defendants' favor on Plaintiff's 42 U.S.C. § 1983 claims against Defendants in their individual capacities.  We DISMISS the appeal as to the statute of limitations defense for lack of jurisdiction.

REVERSED in part, DISMISSED in part, and REMANDED.