Lee H. Rosenthal, Chief United States District Judge
Alfred Dewayne Brown was tried and convicted for capital murder. He spent just over 12 years in prison, most of that time on death row. After the discovery and production of previously withheld exculpatory evidence, the Texas Court of Criminal Appeals vacated Brown's conviction and sentence and remanded the case to the Harris County trial court. Months later, after the District Attorney declined to reprosecute, the court granted Brown's motion to dismiss and released him from custody. In this federal suit, Brown seeks damages under § 1983 from the City of Houston, Harris County, Houston Police Department Detective Breck McDaniel, Harris County Assistant District Attorney Daniel Rizzo, current Harris County District Attorney Kim Ogg, and Houston Police Department Officers Ted Bloyd and D.L. Robertson, for their roles in Brown's conviction. All defendants move to dismiss.
*755 I. Background
This summary of relevant facts is drawn from Brown's complaint and documents in the public record from his trial, appeal, and habeas proceedings. On April 3, 2003, three men-Elijah "Ghetto" Joubert, Dashan "Shawn" Glaspie, and an unidentified third man-went to an Ace Check Cashing store in South Houston to rob it. Glaspie and the third man waited inside a neighboring furniture store while Joubert waited for the store clerk, Alfredia Jones, to arrive. Joubert forced her into the store and demanded that she open the safe. Jones responded that she had to call the store's headquarters to open the safe. When she made the call, she gave the code for a robbery, which resulted in alerting the Houston Police Department. When Houston Police Officer Charles Clark arrived, he fired one shot at the three men, but his gun jammed before he could fire a second. One of the three men shot Officer Clark, killing him instantly. One of the three men shot and killed Jones.
Earlier that morning, Joubert, Glaspie, and an unidentified third man had tried to rob a different check-cashing establishment, but they left when the store owner showed them his gun. Shortly after that, two women, LaTonya Hubbard and Letisha Price, saw and talked briefly to Glaspie, Joubert, and a third man, later identified as Ernest "Deuce" Matthews, at a local gas station. All five individuals lived at the same apartment complex. Neither Hubbard, Price, the check-cashing store owner, nor the furniture-store owner identified Brown as the third man.
After fleeing Ace Check Cashing in Glaspie's car, the three men returned to the apartment complex where Glaspie and Joubert lived. News of the robbery, including a description of Glaspie's car, broke almost immediately. Latonya Hubbard's sister, Lisa Hubbard, called the police and reported that she had seen Glaspie, Joubert, and a third man near Glaspie's car at the apartment complex earlier that day. Lisa Hubbard later identified that third man as Ernest Mathews. At Brown's trial, however, Lisa Hubbard testified that Brown was the third man with Glaspie and Joubert. After the trial, she signed an affidavit stating that her trial testimony was incorrect and that her original identification was the truth. She stated that Rizzo had pressured her to testify falsely to incriminate Brown by identifying him as the third man. Hubbard was specific as to Rizzo's pressure tactics. She stated that he threatened her with a perjury indictment and an indictment for stealing the reward money she had received for coming forward, unless she identified Brown.
Brown alleges that Rizzo also pressured LaTonya Hubbard to falsely identify him as the third man, and that Rizzo pressured a third witness, Sharonda Simon, to falsely testify that she had seen Brown sitting in Glaspie's car the morning of the murders. Brown alleges that Rizzo threatened Simon with causing her to lose custody of her children. Simon later admitted that her trial testimony identifying Brown was not true.
At the time of the murders, Brown lived with his girlfriend, Ericka Dockery. On the day of his arrest, Brown gave police an alibi. He was at home the morning when murders were committed. Dockery confirmed Brown's account with significant detail. Brown alleges that Rizzo repeatedly threatened, intimidated, and harassed Dockery to change her grand jury testimony to inculpate Brown. Rizzo threatened Dockery with an indictment for perjury and to have her children removed from her custody unless she incriminated Brown. When she refused, Rizzo did charge Dockery with three counts of aggravated perjury. She sat in jail for four months, unable to afford bail, until she was released in *756 December 2003 under a plea agreement she negotiated with Rizzo. The agreement required Dockery to meet with Houston Police Department detectives once a week about her testimony or go back to jail. Brown alleges that this coercion and intimidation caused Dockery to change her grand jury and trial testimony to testify that Brown was not at the apartment when the murders were committed. Dockery provided a posttrial affidavit recanting her testimony and detailing Rizzo's intimidation. Brown alleges that Dockery's cousin, Reginald Jones, also corroborated Brown's alibi, but that the police refused to consider his statements.
Glaspie was the primary witness against Brown at his 2004 trial. Glaspie had previously confessed his involvement to the police. Brown alleges that Glaspie received a reduced sentence-30 years instead of a possible death sentence-in exchange for falsely testifying against Brown. Brown alleges that Rizzo knowingly elicited false testimony from Glaspie that Joubert had shot Jones, when Rizzo had reason to believe that Glaspie himself had shot her.
In addition to witness intimidation to produce perjured testimony, Brown alleges that Rizzo and the police unreasonably pursued him despite ample and consistent evidence that he had no involvement in the murders. Brown alleges that the police failed to investigate Jero Dorty, a suspect in a earlier aggravated robbery who the evidence pointed to as the third man involved in this robbery-murder. Telephone records showed that Dorty was a known associate of Joubert, who years later identified Dorty as the third man involved in the robbery-murders.
Brown was convicted and sentenced to death. In April 2013, after Brown had been incarcerated for years, appealed without success, and filed a habeas petition, Houston Police Officer McDaniel "discovered" telephone records from the investigation of Brown's case in his home garage. McDaniel turned the records over to the Harris County District Attorney's Office, which had been subpoenaed to produce them in Brown's habeas case. The District Attorney's Office contacted Judge Ellis, the Harris County district court judge presiding over Brown's pending state habeas petition. Brown alleges that the telephone records corroborated Dockery's evidence in support of his alibi and showed that her recanted testimony had been obtained by intimidation.
In May 2013, Judge Ellis entered Findings of Fact and Conclusions of Law on Brown's habeas petition. Judge Ellis held that the State had withheld material exculpatory evidence. In November 2014, the Texas Court of Criminal Appeals vacated Brown's conviction, finding that the State had committed Brady violations by withholding the telephone records. The case was remanded to the trial court. In June 2015, after the State declined to retry Brown and moved to dismiss the indictment, the trial court granted the motion and dismissed the case. Brown was released from prison. He had spent twelve years there, ten on death row.
Brown alleges the following grounds for relief:
1. violations of § 1983, by fabricating evidence, against all defendants;
2. violations of § 1983, by failing to disclose material evidence, against Harris County, Rizzo, and McDaniel;
3. violations of § 1983, by concealing or conspiring to conceal evidence about Brown's whereabouts and failing to pursue other known leads, against the City of Houston and McDaniel;
4. violations of § 1983 and the 5th, 8th, or 14th Amendments, by creating unconstitutional customs, policies, *757 and practices, against Harris County;
5. violations of § 1983, for unconstitutional polices, customs, and practices by the Houston Police Department, against the City of Houston;
6. violations of § 1983 on a municipal and supervisory liability theory, against the City of Houston; and
7. violations of § 1983 on a municipal and supervisory liability theory, against Harris County.
All defendants have moved to dismiss. Kim Ogg and Harris County filed a joint motion to dismiss, (Docket Entry No. 9), and Rizzo filed a separate motion, (Docket Entry No. 7). Brown filed a consolidated response to both. (Docket Entry No. 22). The City of Houston, McDaniel, Bloyd, and Robertson filed a single motion to dismiss, (Docket Entry No. 24), to which Brown responded. (Docket Entry No. 32). Rizzo, Ogg, and the City defendants all replied to Brown's response. (Docket Entry Nos. 25, 26, 33). The motions and responses raise different issues; all are analyzed below.
II. The Legal Standard For Dismissal
Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a) (2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corporation v. Twombly , 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Rule 8"does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Twombly , 550 U.S. at 555, 127 S.Ct. 1955 ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly , 550 U.S. at 556, 127 S.Ct. 1955 ). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly , 550 U.S. at 556, 127 S.Ct. 1955 ).
To withstand a Rule 12(b)(6) motion, a "complaint must allege 'more than labels and conclusions,' " and "a formulaic recitation of the elements of a cause of action will not do." Norris v. Hearst Trust , 500 F.3d 454, 464 (5th Cir. 2007) (quoting Twombly , 550 U.S. at 555, 127 S.Ct. 1955 ). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " Iqbal , 556 U.S. at 678, 129 S.Ct. 1937 (alteration in original) (quoting Twombly , 550 U.S. at 557, 127 S.Ct. 1955 ). "[A] complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief-including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " Cuvillier v. Taylor , 503 F.3d 397, 401 (5th Cir. 2007) (quoting Twombly , 550 U.S. at 555, 127 S.Ct. 1955 ). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." Id. (quoting Twombly , 550 U.S. at 558, 127 S.Ct. 1955 ) (internal quotation marks and alteration omitted).
When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff a chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile. See *758 Carroll v. Fort James Corp. , 470 F.3d 1171, 1175 (5th Cir. 2006) (Rule 15(a) "evinces a bias in favor of granting leave to amend"); Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co. , 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."). A court may deny a motion to amend for futility if an amended complaint would fail to state a claim upon which relief could be granted. Villarreal v. Wells Fargo Bank, N.A. , 814 F.3d 763, 766 (5th Cir. 2016) (citing Stripling v. Jordan Production Co. , LLC, 234 F.3d 863, 873 (5th Cir. 2000) ). The decision to grant or deny leave to amend "is entrusted to the sound discretion of the district court." Pervasive Software Inc. v. Lexware GMBH & Co. , 688 F.3d 214, 232 (5th Cir. 2012).
III. Analysis
A. The Statute of Limitations
All three motions to dismiss argue that Brown's claims are barred under the two-year statute of limitations for a § 1983 action. The parties agree that the limitations period is two years. See Brockman v. Tex. Dep't of Crim. Justice , 397 Fed.Appx. 18, 21 (5th Cir. 2010) ("Since there is no federal statute of limitations for ... § 1983 claims, we look to the general personal injury limitations period provided by the forum state, which in this case is Texas's two-year limitations period.") (citing TEX. CIV. PRAC. & REM. CODE § 16.003(a) ). The parties dispute when the § 1983 causes of action accrued and therefore when the two-year limitations period began and ended.
The defendants argue that Brown's causes of action accrued on the date that the Texas Court of Criminal Appeals vacated his conviction, in November 2014. Brown argues that his causes of action accrued on the date the State dismissed the case against him, in June 2015-seven months after the order vacating his conviction and remanding to the trial court. In the alternative, Brown argues that he is entitled to equitable tolling because Ogg induced him to delay filing his complaint between November 2016 and May 2017.
In Heck v. Humphrey , 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court held that a prisoner may not sue under § 1983 to challenge the constitutionality of his conviction by seeking monetary damages if that conviction still stands. If the § 1983 action seeks "damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 486-87, 114 S.Ct. 2364. The Court looked to the analogous common-law tort cause of action-malicious prosecution-and held that Heck's damages suit was barred because it was related to "a conviction or sentence that ha[d] not been so invalidated." Id. at 487, 114 S.Ct. 2364. The bar was necessary, the Court explained, to avoid parallel civil and criminal litigation and inconsistent judgments on the same issues of probable cause and guilt. Id. at 484, 114 S.Ct. 2364. To allow a civil § 1983 claim to proceed alongside a criminal proceeding would, in effect, create a new vehicle for collaterally attacking the underlying conviction. Id.
In Wallace v. Kato , 549 U.S. 384, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007), the *759 Court addressed the relationship between the Heck bar and when a § 1983 cause of action accrues. The petitioner in Wallace was arrested, tried, and convicted of first-degree murder. Id. at 386, 127 S.Ct. 1091. On direct appeal, the court had determined that the officers had arrested the plaintiff without probable cause, in violation of the Fourth Amendment, which led to the use of inadmissible statements in the petitioner's first trial. Id. at 387, 127 S.Ct. 1091. The appellate court remanded for a new trial. The prosecutors dropped the charges about eight months later. Id. A year after that, the plaintiff filed a § 1983 suit against the city and several police officers, seeking damages for his unlawful arrest. The Supreme Court again determined the accrual date by looking to the analogous common-law tort. Because the plaintiff challenged his unlawful arrest, the analogous common-law tort was false imprisonment. The plaintiff argued that Heck deferred the accrual of his § 1983 cause of action until his conviction was vacated and the charges were dropped, but the Court disagreed: "the Heck rule for deferred accrual is called into play only when there exists 'a conviction or sentence that has not been ... invalidated,' that is to say, an 'outstanding criminal judgment.' It delays what would otherwise be the accrual date of a tort action until the setting aside of an extant conviction which success in that tort action would impugn." Id. at 393, 127 S.Ct. 1091 (citation omitted). The Court rejected the plaintiff's proposed rule "that an action which would impugn an anticipated future conviction cannot be brought until that conviction occurs and is set aside." Id. One problem with the proposed rule was that "it would require the plaintiff (and if he brings suit promptly, the court) to speculate about whether a prosecution will be brought, whether it will result in conviction, and whether the pending civil action will impugn the verdict." Id.
The defendants argue that under Wallace , Brown's § 1983 claims accrued when the Court of Criminal Appeals granted his habeas petition. The Wallace Court noted, however, that it "expressly limited [its] grant of certiorari to the Fourth Amendment false-arrest claim." Id. at 387, n.1, 127 S.Ct. 1091. A plaintiff's § 1983 action for unlawful arrest rests on a different common-law analogue than a § 1983 action for wrongful conviction. In Aly v. City of Lake Jackson , 453 Fed.Appx. 538, 539 (5th Cir. 2011) (per curiam) (unpublished), the Fifth Circuit explained the difference between a § 1983 suit based on an abuse of process claim and a § 1983 suit based on a wrongful conviction claim. The plaintiff was arrested and charged with credit-card abuse and released on bond the following day. The charges against him were dismissed 14 months later. The Fifth Circuit's per curiam opinion stated:
If Aly's cause of action is analogous to the common law tort of malicious prosecution, then his complaint would have been timely because a malicious prosecution claim only accrues once the criminal charges are dismissed.
...
However, Aly's claim is not analogous to malicious prosecution because the claim of malicious prosecution requires proof "that the criminal proceeding was initiated or continued by the defendant without probable cause."
...
Here, Aly has not alleged that the City initiated or continued the criminal proceedings against him without probable cause. Instead Aly has only asserted that the City targeted and prosecuted him for an improper purpose, i.e., because of his ethnicity. Therefore, Aly's claim is not analogous to malicious prosecution.
*760 Id. at 539 (quoting PROSSER & KEETON ON THE LAW OF TORTS §§ 119, at 876 (5th ed. 1984) ). Instead, the Fifth Circuit found that Aly's claims were analogous to the common-law tort of abuse of process, because he alleged the misuse of the judicial process for a racially discriminatory purpose. Because the key to abuse of process is the purpose for which the process is used, the plaintiff need not establish that the proceeding terminated in his favor.
When Brown's § 1983 claim accrued depends on which common-law tort action is analogous to his claim, false arrest or imprisonment, abuse of process, or malicious prosecution. See Lopez v. Unknown Galveston Police Officer # 1, No. G-06-0371, 2007 WL 1108736, 2007 U.S. Dist. LEXIS 26808 (S.D. Tex. Apr. 11, 2007) (Lake, J.) (revisiting the court's prior determination that the plaintiff's § 1983 claims did not accrue until the prosecution ended in his favor, based on the intervening decision in Wallace , but only as to the plaintiff's wrongful-arrest claim); Harris v. Rivera , No. 3:11-CV-3013-D, 2013 WL 246709, at *6-7, 2013 U.S. Dist. LEXIS 8866, at *18-19 (N.D. Tex. Jan. 23, 2013) (distinguishing between accrual dates for limitations for the plaintiff's various § 1983 claims).
The Texas common-law tort of malicious prosecution requires a plaintiff to establish:
(1) the commencement of a criminal prosecution against the plaintiff;
(2) causation (initiation or procurement) of the action by the defendant;
(3) termination of the prosecution in the plaintiff's favor;
(4) the plaintiff's innocence;
(5) the absence of probable cause for the proceedings;
(6) malice in filing the charge; and
(7) damage to the plaintiff.
Richey v. Brookshire Grocery Co. , 952 S.W.2d 515, 517 (Tex. 1997). By contrast, "[t]he essential elements of false imprisonment are: (1) willful detention; (2) without consent; and (3) without authority of law." Wal-Mart Stores, Inc. v. Rodriguez , 92 S.W.3d 502, 506 (Tex. 2002). Abuse of process, on the other hand, requires the plaintiff to show: "(1) the defendant made an illegal, improper, or perverted use of the process, a use neither warranted nor authorized by the process; (2) the defendant had an ulterior motive or purpose in exercising such illegal, perverted, or improper use of the process; and (3) damage to the plaintiff as a result of such illegal act." Hunt v. Baldwin , 68 S.W.3d 117, 129 (Tex. App.-Houston [14th Dist.] 2001, no pet.). "It is critical that the process be improperly used after it has been issued ... In other words, the original issuance of a legal process is justified, but the process itself is subsequently used for a purpose for which it was not intended." Id. at 130 (citations omitted). "If wrongful intent or malice caused the process to be issued initially, the claim is instead one for malicious prosecution." Id. (citation omitted).
Brown alleges that the defendants indicted and prosecuted him without probable cause, despite evidence showing that he was innocent and that another individual was guilty, and using testimony that they obtained by coercion and knew was perjured, resulting in 12 years of wrongful incarceration. Brown's § 1983 claims are most analogous to the malicious-prosecution tort. Brown alleges that "the Defendants went to unbelievable lengths to manipulate evidence such that it would support Mr. Brown's conviction and also conceal exculpatory evidence that would exonerate him," "actively harassed and intimidated multiple witnesses into providing false testimony against Mr. Brown," and "knowingly withheld exculpatory evidence that ultimately exonerated Mr. Brown." (Docket Entry No. 1 at 2-3). In short, Brown alleges that the defendants "initiated [and] continued the criminal *761 proceedings against him without probable cause," precisely what the Fifth Circuit in Aly described would have been a § 1983 malicious-prosecution-based claim. 453 Fed.Appx. at 539. Because Brown alleges a § 1983 claim most analogous to a malicious-prosecution claim under state law, Wallace does not require the conclusion that Brown's § 1983 claims accrued when the Court of Criminal Appeals vacated his conviction and remanded.
The defendants focus on the Heck language that the statute of limitations begins to run as soon as a conviction or sentence is "invalidated." (Docket Entry No. 25 at 5 (citing 512 U.S. at 489, 114 S.Ct. 2364 ) ). The defendants cite Wilson v. Barcella , No. H-05-3646, 2007 WL 963977, at *12-13 (S.D. Tex. Mar. 29, 2007) (Rosenthal, J.), to support their argument that the " Heck bar is not lifted when the plaintiff is no longer incarcerated," but instead when the conviction is invalidated, even before the charges are dismissed or the defendant is released. But, as Brown notes, Heck resolves only one question. "The issue, which is not answered in its entirety by Heck , is what constitutes a favorable termination." (Docket Entry No. 22 at 20) (emphasis in original). The Wilson language the defendants cite is taken out of context. In Wilson , the defendant argued that although his convictions still stood, Heck no longer barred his suit when he was released from custody. The court disagreed, stating that release from custody, on its own, was not enough to lift the Heck bar. The defendants here suggest that this language indicates that vacating a conviction and remanding for further proceedings is when a § 1983 cause of action accrues. It does not.
Brown relies on Brandley v. Keeshan, 64 F.3d 196 (5th Cir. 1995),[1] for his argument that "favorable termination" did not occur-and his § 1983 cause of action did not accrue-until the state trial court dismissed the charges against him. In Brandley , the plaintiff had previously been tried twice for rape and murder. The first trial resulted in a hung jury, the second in a conviction and death sentence. The Court of Criminal Appeals affirmed the conviction on direct appeal but later granted Brandley's habeas petition, finding that the prosecution had suppressed evidence and improperly investigated the case. Id. at 198. The Court of Criminal Appeals set aside Brandley's conviction and remanded. Brandley was released, but he had not yet been retried when he sued under § 1983 and Texas tort law. The federal district court held that Brandley's habeas petition had tolled the statute of limitations for his § 1983 claim until the date his conviction was set aside, but that the statute of limitations for his state-law claims had begun to run earlier because the state claims were not implicated in Brandley's habeas petition. Id. at 198-99. The Fifth Circuit disagreed, holding that under Heck , "[t]he underlying criminal proceeding must terminate in the plaintiff's favor before a malicious prosecution claim accrues." Id. at 199. Addressing the state-law tort claims, the court stated that "[t]ypically, an order of dismissal based on the running of the statute of limitations on the crime or an order of dismissal reflecting an affirmative decision not to prosecute are examples of such a termination ." Id. (emphasis added). "Even a prosecutor's failure to act on remand will at some point entitle a defendant to an order of dismissal. However, the reversal of a conviction and remand for a new trial is not, in and of itself, a termination." Id. Because Brandley's conviction had been vacated, but the State had not yet decided whether to reprosecute or dismiss *762 the charges against him, the Fifth Circuit remanded for a determination if and when the criminal prosecution had terminated, a fact-specific question for the district court to decide.
The defendants attempt to distinguish Brandley because the quoted language referred to the state-law malicious-prosecution claims, not to the § 1983 claim. But to determine when Brown's § 1983 action accrued, the court must look to the most analogous state common-law tort, which is malicious prosecution. The Fifth Circuit in Brandley noted that whether and when the underlying prosecution terminated "impacts the question of whether or not Brandley's § 1983 claims are ripe for adjudication, [but that] those claims remain pending below and are not before [the court] on this appeal." Id. at 199, n.2. Under Brandley , Brown's § 1983 claims did not accrue when the state appellate court granted his habeas petition, vacated his conviction, and remanded to the state trial court for further proceedings. Rather, they accrued when the underlying state criminal case terminated in his favor, which was when the State elected not to reprosecute him and the trial court dismissed the charges.
Harris County argues that § 1983 actions based on Brady violations are different. According to Harris County, these claims do not require dismissal of the charges for "a favorable termination" triggering § 1983 claim accrual. Instead, the County argues, Brown's claims based on the allegations that the defendants had withheld exculpatory evidence accrued when Brown was aware of the injury, that is, when the Texas Court of Criminal Appeals recognized that a Brady violation had occurred and set aside his conviction and remanded. For this proposition, Harris County relies on Brandley , arguing that the Fifth Circuit had recognized that Brady -based § 1983 claims do not require a favorable termination in the form of dismissal for accrual. Brandley does not say this, explicitly or implicitly. In Brandley , the plaintiff asserted Brady -based § 1983 claims for withholding evidence that ultimately led to the Texas Court of Criminal Appeals to grant his habeas petition. The Fifth Circuit distinguished between Brandley's state-law claims for malicious prosecution and his claims for false arrest, a decision later refined by Wallace . But the Fifth Circuit did not distinguish between Brandley's claims grounded in Brady violations and those resting on other grounds.
Most circuits considering the issue do not distinguish between when a plaintiff's Brady -based § 1983 claims accrue and when § 1983 claims based on other grounds accrue. In Owens v. Baltimore City State's Attorneys Office , 767 F.3d 379, 391 (4th Cir. 2014), the Fourth Circuit explained that the underlying rationale in Heck does not justify a different accrual trigger for Brady -based § 1983 claims: "[T]he 'strong judicial policy against the creation of conflicting resolutions arising out of the same or identical transaction' furthered by malicious prosecution's favorable termination requirement is also implicated in the Brady context." 767 F.3d at 392. The Owens court noted that the claim in Heck , analogized to the common-law tort of malicious prosecution for determining accrual, was itself a Brady -based § 1983 claim. Id. ; see also Johnson v. Dossey , 515 F.3d 778, 782 (7th Cir. 2008) ("A Brady claim, on the other hand, is not controlled by Wallace , by rather by Heck ."). On the other hand, the Eighth Circuit has held that a Brady -based § 1983 claim is controlled by Wallace . See Buckley v. Ray , 848 F.3d 855, 867 (8th Cir. 2017) ("The Supreme Court's decision in Wallace controls Buckley's [Brady ] claim. The trial court invalidated Buckley's 1999 conviction on November 1, 2010. No extant conviction exists for his § 1983 claims to *763 impugn. The possibility that the State may have re-tried and convicted him of the cocaine charges-"an anticipated future conviction "-does not implicate the Heck rule.").
The Second Circuit follows a third approach, distinguishing between procedure-based Brady claims and substance-based Brady claims. In Poventud v. City of New York , 750 F.3d 121 (2d Cir. 2014) (en banc), the court explained that a Brady violation necessarily implies the invalidity of the challenged conviction only in the trial in which the Brady violation occurred. The remedy for a Brady violation, the court noted, is a new trial with disclosure of the previously suppressed evidence, which by its nature would not repeat the violation. Id. at 132. A procedural Brady violation, like the one at issue in the Poventud case, does not depend on factual innocence, but on what would have been proven without the violation.
In Poventud , the district court treated the § 1983 claim as one based on malicious prosecution, not on a denial of due process. The lower court held that the § 1983 claim would undermine the validity of Poventud's subsequent plea to a lesser charge because of his prior alibi defense. The Second Circuit disagreed and clarified that "had Poventud's complaint sounded in malicious prosecution, rather than in a procedural Brady -based claim, that claim would have been barred because of the favorable termination element of the malicious prosecution tort." Id. at 136. Because Poventud asserted only procedural violations, his "Brady claim [was] compatible with the validity of his subsequent conviction." Id. at 137 (citation omitted). The court made its point even more clear by explaining:
Assuming arguendo that Poventud's claims did sound in malicious prosecution, these claims would be barred. Specifically, claims that undisclosed evidence included 'evidence of innocence' do suggest a malicious prosecution claim. However, while Heck's complaint alleged destruction of 'evidence which was exculpatory in nature and could have proved [his] innocence,' Poventud's complaint is less concerned with innocence and instead focuses on 'evidence that an identifying witness was unreliable, and evidence impeaching the credibility of significant prosecution witnesses.'
Id. at 137, n. 20 (citations omitted). In an earlier case on the intersection of § 1983, Brady , and Heck , the Second Circuit found that Heck barred the plaintiff's § 1983 Brady claim that was based on a theory of conspiracy to frame him for a murder that he had not committed, because success on the § 1983 claim would go to his innocence and was incompatible with his conviction. As a result, "deciding in his favor on any of [his claims] plainly would call into question the validity of his conviction." Amaker v. Weiner , 179 F.3d 48, 52 (2d Cir. 1999). Because the plaintiff maintained that the suppressed evidence went to his actual innocence and not merely to procedural due process, his civil § 1983 claims would necessarily impugn the validity of the conviction and would be barred under Heck .
Consistent with Brandley and with the weight of persuasive authority in other circuits, Brown's Brady -based § 1983 claims are not subject to a different and earlier accrual standard, as Harris County argues. The § 1983 claims Brown asserts based on the suppression of the phone records go to the very heart of his claim of innocence and thus to the substantive validity of his conviction. Those § 1983 claims were barred until the State declined to reprosecute and the trial court dismissed the charges against him. That is when his § 1983 claims accrued and the statute of limitations began to run.
*764 This result is also consistent with a case involving similar facts decided in January 2017 in the Eastern District of Pennsylvania. Wright v. City of Philadelphia , 229 F.Supp.3d 322 (E.D. Pa. 2017), involved a § 1983 action against the City of Philadelphia and individual police officers based on an allegedly wrongful conviction for rape and murder. Wright alleged that the defendants fabricated evidence, coerced a false confession, and withheld exculpatory evidence, leading to his arrest, prosecution, conviction, and sentence to life without parole, all for a crime he did not commit. Wright was convicted by a jury and sentenced to life without parole. Based on new DNA evidence, the District Attorney agreed to vacate Wright's sentence, but chose to retry the case. The jury acquitted, and Wright sued under § 1983.
The defendants moved to dismiss Wright's § 1983 claims as untimely, including the claims for fabricating evidence and for withholding exculpatory and impeachment evidence. Id. at 329. The defendants argued that the § 1983 claims had accrued when Wright was tried and convicted at the first trial. Wright argued that his claims did not accrue until the "favorable termination of the criminal proceedings against him," which was when he was acquitted. Id. The court analyzed both Heck and Wallace , noting that Wallace was limited to § 1983 actions based on Fourth Amendment violations and did not otherwise impact the Heck rule of deferred accrual. Id. at 333. The key was whether the § 1983 claims involved the trial process. Section 1983 claims based on allegations that the defendants' misconduct infected the trial process itself mean that any conviction resulting from that misconduct "would necessarily be impugned by success on the § 1983 claims." Id. (citing Moore v. Burge , 771 F.3d 444, 446 (7th Cir. 2014) ). Because Wright's § 1983 claim was analogous to a common-law malicious prosecution claim and involved allegedly defective trial processes, his § 1983 cause of action did not accrue until his acquittal terminated the underlying criminal proceedings.
Here, as in Wright , Brown was convicted at trial and subsequently had his sentence vacated as the result of newly discovered exculpatory evidence. In both cases, the vacated conviction was later formally dismissed, in Wright by acquittal and here by the State's decision not to reprosecute Brown and the trial court's dismissal of the charges. Brown's allegations attack the integrity of his criminal trial. Brown's § 1983 claims did not accrue until the criminal proceedings against him terminated in his favor. That occurred when the State chose not to retry him, and the trial court formally dismissed the criminal charges on June 8, 2015.
This is consistent with Heck , which bars premature § 1983 actions to prevent dual challenges to criminal convictions that could result in inconsistent outcomes. When Brown's conviction was vacated, he faced reprosecution for the same charges. Had he been allowed to bring his § 1983 action, Brown could have been litigating the validity of his prosecution civilly while being retried and possibly convicted for the same charges criminally. Because Brown's § 1983 action depends on the invalidity of his conviction, the action was barred until the criminal proceedings were dismissed. His § 1983 action was timely filed.
The defendants' motions to dismiss on this ground are denied.[2]
B. Harris County is Not a Proper Party
Rizzo, Ogg, and Harris County all argue that Harris County is not a proper party *765 to this action and therefore is entitled to dismissal. All parties agree that, in general, the State is the proper defendant for claims of prosecutorial misconduct. See, e.g. , Esteves v. Brock , 106 F.3d 674, 678 (5th Cir. 1997) ("Texas law makes clear, however, that when acting in the prosecutorial capacity to enforce state penal law, a district attorney is an agent of the state, not the county in which the criminal case happens to be prosecuted."); see also James v. Harris County , 577 F.3d 612, 617 (5th Cir. 2009) ("A municipality is not liable under § 1983 on the theory of respondeat superior, but instead only for acts that are directly attributable to it 'through some official action or imprimatur.' ") (quoting Piotrowski v. City of Houston , 237 F.3d 567, 578 (5th Cir. 2001) ).
Brown argues that a county may be held liable for a district attorney's actions that are beyond the scope of prosecutorial duties or for unconstitutional policies or customs and practices that the county implements. Brown seeks to hold Harris County liable for: (1) Rizzo's actions outside of the scope of his prosecutorial duties; (2) a policy or custom and practice of failing to train its employees in Brady obligations; and (3) other unconstitutional policies or customs and practices. Each argument is analyzed below.
1. The County's Alleged Liability for Prosecutorial Misconduct Outside the Scope of Rizzo's Prosecutorial Duties
"The Fifth Circuit has recognized that Texas district attorneys act as agents of the State for alleged misconduct when instituting criminal proceedings to enforce state law." Estrada v. Healey , No. H-15-0092, 2015 WL 13158514, at *10 (S.D. Tex. June 4, 2015) (Atlas, J.) (citing Echols v. Parker , 909 F.2d 795, 801 (5th Cir. 1990) ). "If a district attorney exceeds the scope of his prosecutorial duties, a county may be held liable under certain limited circumstances." Krueger v. Reimer , 66 F.3d 75, 77 (5th Cir. 1995). If, for example, a district attorney engages in "duties of a prosecutor that are administrative or managerial in nature," or if the district attorney "functions as a 'final policymaker' for the county instead of acting in her prosecutorial capacity as an agent of the State," then the county may be liable. Estrada , 2015 WL 13158514, at *10 (citing Brown v. Lyford , 243 F.3d 185, 192 (5th Cir. 2001) ).
Harris County adopts the portions of Rizzo's motion to dismiss that address prosecutorial immunity. (Docket Entry No. 25 at 4). Both municipal liability and Rizzo's prosecutorial immunity turn on the scope of Rizzo's prosecutorial duties. Those arguments are addressed under Rizzo's motion to dismiss based on his absolute prosecutorial immunity.
2. The County's Liability for Allegedly Unconstitutional Policies or Customs and Practices
"To hold a municipality liable under § 1983 for the misconduct of an employee, a plaintiff must show, in addition to a constitutional violation, that an official policy promulgated by the [municipality]'s policymaker was the moving force behind, or actual cause of, the constitutional injury." James v. Harris Cty , 577 F.3d 612, 617 (5th Cir. 2009). "The official policy itself must be unconstitutional or, if not, must have been adopted 'with deliberate indifference to the known or obvious fact that such constitutional violations would result.' " Id.
"Official policy can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.' " Id. (quoting Piotrowski , 237 F.3d at 579 ). "A policy is official only 'when it results from the decision or acquiescence *766 of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy.' " Id. (quoting Jett v. Dallas Indep. Sch. Dist. , 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) ). "Although an official policy can render a municipality culpable, there can be no municipal liability unless it is the moving force behind the constitutional violation." Id. (citing Piotrowski , 237 F.3d at 580 ). "In other words, a plaintiff must show direct causation, i.e., that there was a direct causal link between the policy and the violation." Id. If a plaintiff cannot show that the policy itself is facially unconstitutional, he must show the policy was "adopted with deliberate indifference as to its known or obvious consequences." Id. "Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it 'must amount to an intentional choice, not merely an unintentionally negligent oversight.' " Id. at 617-18 (quoting Rhyne v. Henderson Cty , 973 F.2d 386, 392 (5th Cir. 1992) ).
Brown alleges (1) a policy or custom and practice to inadequately train and supervise Assistant District Attorneys in Brady obligations, and (2) a "whatever it takes" policy or custom and practice that encouraged Assistant District Attorneys "to aggressively pursue convictions regardless of the weight of the evidence against a particular defendant; to secure favorable witness testimony at any cost, including unlawful means of pressure and intimidation; [and] to unethically solicit false testimony from witnesses." (Docket Entry No. 1 at 45). Brown argues that he sufficiently alleges a "conviction culture and 'do whatever it takes' policy that encouraged Assistant District Attorneys to ignore constitutional protections if it meant securing a conviction." (Docket Entry No. 22 at 28).
Brown bases his claim of Harris County's deliberate indifference on an alleged pattern of similar violations. See, e.g. , Sanders-Burns v. City of Plano , 594 F.3d 366, 381 (5th Cir. 2010). Brown also alleges that Harris County ratified Rizzo's unconstitutional conduct, making it subject to liability under City of St. Louis v. Praprotnik , 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Harris County does not dispute that this legal theory of liability exists, but rather challenges the adequacy of Brown's allegations that the County had notice of prior, similar constitutional violations. Harris County argues that while Brown generally alleges a certain "culture" at the Harris County District Attorney's Office and gives some examples, he fails to "connect the dots" to allege Harris County's knowledge of, and deliberate indifference to, resulting constitutional violations.
In the alternative, Brown argues that his complaint allegations are sufficient to permit discovery to develop the record more fully and have the critical issue of Harris County's deliberate indifference decided at summary judgment or at trial. Brown points out that the defendants possess "unique information and knowledge" about the policies, practices, and customs. (Docket Entry No. 22 at 30). He argues that Rule 11 permits him to proceed. The court agrees with Brown.
Brown has sufficiently alleged the three requirements for a § 1983 municipal-liability claim. He has identified the relevant policymakers-Charles Rosenthal, Jr., the District Attorney from 2001-2008, and Mike Anderson, the District Attorney immediately before Kim Ogg. He has identified the relevant policy or custom and practice-the "do whatever it takes" conviction culture. He has alleged the "moving force" behind his unconstitutional conviction and injury-the policy or custom and practice of obtaining convictions at all costs.
*767 "In the context of municipal liability, as opposed to individual officer liability, it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery. Accordingly, only minimal factual allegations should be required at the motion to dismiss stage. Moreover, those allegations need not specifically state what the policy is, as the plaintiff will generally not have access to it, but may be more general." Thomas v. City of Galveston , 800 F.Supp.2d 826, 843 (S.D. Tex. 2011) (Ellison, J.); see also Sanchez v. Gomez , 283 F.Supp.3d 524, 532-33 (W.D. Tex. 2017) (citing Thomas to find that "while stating a claim against a municipality requires more than a barebones recitation of the elements of municipal liability, plaintiffs need not 'specifically state what the [municipal] policy is' and can rely on 'minimal factual allegations' at this state in the litigation."). Brown has alleged sufficiently specific details about the policy and policymakers he challenges, and the alleged constitutional violations they caused, to rise above the level of a "barebones recitation." The motion to dismiss on this basis is denied.
3. The County's Liability for Failing to Train Prosecutors
The failure-to-train allegations against the County are on less secure ground. In Texas, "claims for failure to train prosecutors on Brady duties are deemed claims against the State, not the County." Estrada v. Healey , No. H-15-00921, 2015 WL 13158515, at *6, 2015 U.S. Dist. LEXIS 100721, at *19 (S.D. Tex. July 31, 2015) (Atlas, J.) (citing Mowbray v. Cameron Cty., Tex. , 274 F.3d 269, 278 (5th Cir. 2001) ). Brown alleges a failure to train "with respect to [the Assistant District Attorneys'] duty to disclose to defense counsel all material exculpatory and impeachment evidence and/or to verify the veracity of the evidence its attorneys presented at trial." (Docket Entry No. 1 at 45). In his response to the defendants' motions to dismiss, Brown describes two ways a municipality may be deliberately indifferent to the need for proper training. (Docket Entry No. 22 at 27). To the extent that Brown's claims are based solely on the failure to train on Brady obligations, Brown is on shaky ground. This claim is properly against the State, not the County. To the extent that Brown alleges a more general "failure to train," he provides insufficient details about what was deficient, other than the training in Brady obligations. (Docket Entry No. 1 at 45, ¶ 187). And to the extent Brown argues that the failure to train on Brady obligations was an official Harris County policy, that argument fails as well.
In Connick v. Thompson , 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011), the Court held that while "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983, ... [a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Id. "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.' " Id. (quoting City of Canton v. Harris , 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ). The Court continued:
Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular *768 omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'
Id. at 61-62, 131 S.Ct. 1350 (citations omitted). The Court in Thompson recognized that a pattern of prior similar violations is "ordinarily necessary" to demonstrate deliberate indifference. Id. at 63, 131 S.Ct. 1350. The Court rejected Thompson's "single-incident" theory, finding the single Brady violation alleged insufficient as a matter of law to support a claim for failure-to-train on Brady obligations, but not foreclosing the possibility that a single incident could create municipal liability. Id. at 63, 131 S.Ct. 1350.
Thompson and the similar case of Truvia v. Connick , 577 Fed.Appx. 317 (5th Cir. 2014), both involved an attempt to impose liability against the local district attorney's office in Louisiana, which recognizes § 1983 claims for prosecutorial misconduct against the local governmental entity, rather than only against the State. A Texas plaintiff cannot rely on Connick v. Thompson because of the difference in liability for prosecutorial conduct between Louisiana and Texas. See Estrada v. Healey , No. H-15-0092, 2015 WL 13158514, at *14 (S.D. Tex. June 4, 2015) (Atlas, J.). The Supreme Court and Fifth Circuit case law makes clear that in most states, including Texas, § 1983 liability for prosecutorial misconduct lies against the state, not a county. This includes alleged liability for failing to train prosecutors on Brady duties. Estrada v. Healey , No. H-15-00921, 2015 WL 13158515, at *6, 2015 U.S. Dist. LEXIS 100721, at *19 (S.D. Tex. July 31, 2015) (Atlas, J.) (citing Mowbray v. Cameron Cnty., Tex. , 274 F.3d 269, 278 (5th Cir. 2001) ).
Counsel has not cited, and the court cannot find, a case decided under Texas law supporting the theory that a failure to train prosecutors about their Brady obligations can be sustained under an "official policy" theory against a county's district attorney's office. A factually close case avoids the issue. In Ramirez v. Abreo , No. 5:09-CV-190-C, 2011 WL 13136494, 2011 U.S. Dist. LEXIS 160016 (N.D. Tex. June 8, 2011), the court denied summary judgment on the plaintiff's claim that Lamb County had an unconstitutional custom relating to Brady and Giglio disclosures, and granted summary judgment for the County on the plaintiff's claim of failure to train on disclosure obligations. The court rejected the plaintiff's "single incident" theory but did not address the plaintiff's ability to proceed against the County in the first place. see also Estrada v. Healey , No. H-15-0092, 2015 WL 13158514, at *14 (S.D. Tex. June 4, 2015) (the plaintiff could not rely on Connick because Texas law requires claims for prosecutorial misconduct to be brought against the State, not the County, but analyzing the merits of the failure-to-train claim).
The motion to dismiss the failure-to-train claim against Harris County is granted.
C. Harris County and Kim Ogg's Motion to Dismiss or Motion for a More Definite Statement
Harris County and Kim Ogg also argue that Brown has failed to allege sufficient facts to state a § 1983 claim. (Docket Entry No. 9 at 13). Harris County argues that, even if the court found that the County could be liable for the misconduct of the District Attorney or Assistant District Attorney, Brown fails to plead facts showing *769 that a Harris County policymaker had notice of a pattern of prior similar violations. (Docket Entry No. 9 at 14). Brown again argues that he has sufficiently alleged a pattern and practice of prior Brady violations; that Harris County ratified Rizzo's unconstitutional conduct; and that it would be premature to dismiss his claims as opposed to considering them after an opportunity for discovery into Harris County's policies and practices and knowledge of prior similar cases. (Docket Entry No. 22 at 28-31).
The court agrees that Brown has sufficiently alleged the factual basis for his § 1983 claim to withstand dismissal under Rule 12(b)(6). Rule 11 permits discovery and consideration of the arguments on a fuller record, by summary judgment or at trial. The alternative motion for a more definite statement is denied; Harris County has not met the requirements for the pleading detail it seeks at this stage of the litigation.
D. Rizzo's Motion to Dismiss and Harris County's Motion to Dismiss The Claims Against It Based on Rizzo's Conduct
Rizzo argues that he is entitled to absolute immunity and that Brown alleged insufficient facts to state a claim under § 1983. (Docket Entry No. 7). Brown responds that Rizzo is not entitled to absolute immunity because his conduct exceeded the scope of his prosecutorial function. (Docket Entry No. 22 at 14).
"A prosecutor enjoys absolute immunity when her actions are 'intimately associated with the judicial phase of the criminal process.' " Loupe v. O'Bannon , 824 F.3d 534, 538 (5th Cir. 2016) (quoting Imbler v. Pachtman , 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) ). "Absolute prosecutorial immunity is meant to 'protect[ ] the prosecutor from harassing litigation that would divert his time and attention from his official duties' and to 'enabl[e] him to exercise independent judgment when deciding which suits to bring and in conducting them in court.' " Id. (alterations in original) (quoting Kalina v. Fletcher , 522 U.S. 118, 125, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997) ). To determine whether absolute immunity applies, the court "must apply the functional approach, looking 'to the nature of the function performed, not the identity of the actor who performed it.' " Id. at 539 (quoting Buckley v. Fitzsimmons , 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) ).
"A prosecutor is absolutely immune for initiating and pursuing a criminal prosecution, for actions taken in her role as advocate for the state in the courts, or when her conduct is intimately associated with the judicial phase of the criminal process." Id. (citation omitted). "On the other hand, a prosecutor is afforded only qualified immunity for acts performed in the course of 'administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings.' " Id. (quoting Buckley , 509 U.S. at 273, 113 S.Ct. 2606 ).
The Supreme Court in Buckley discussed the circumstances in which a prosecutor is entitled to absolute immunity. 509 U.S. at 269-271, 113 S.Ct. 2606. A prosecutor has absolute immunity for acts initiating and pursuing a criminal prosecution, including presenting the State's case at trial, and for participating in a probable-cause hearing. A prosecutor has no absolute immunity for legal advice given to the police, nor for administrative duties or investigatory functions that do not relate to an advocate's preparation to initiate prosecution or further judicial proceedings. A prosecutor has no absolute immunity for statements to the media. The Court explained:
*770 A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial. When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same.
Id. at 276, 113 S.Ct. 2606.
Brown alleges that Rizzo acted outside the scope of his duties as a prosecutor and is not entitled to absolute immunity for two categories of conduct:
1. conduct between April and July 2003, including: securing false testimony from Lisa Hubbard (in part by paying her a $10,000 Crime Stoppers reward), and continuing to pressure her to testify falsely before the grand jury; threatening Sharonda Simon that unless she identified Brown as the third man in Glaspie's car the morning of the robbery, she would be arrested and lose custody of her children; indicting Ericka Dockery for perjury for testifying favorably to Brown; and threatening Dockery that unless she testified falsely against Brown, she would stay in jail on the perjury charges and lose custody of her children; and
2. conduct after Brown's indictment but before his trial, including withholding exculpatory evidence, specifically telephone records, and ignoring and withholding evidence that it was Glaspie who shot Jones.
Rizzo argues that preparing witness testimony for a grand jury or for trial, including finding and working with witnesses on what information the witnesses say they will testify to, is not merely investigatory. Instead, it is a core prosecutorial function. Rizzo contends that all the challenged actions were within the scope of his core prosecutorial functions of "preparing witnesses, focusing on suspects and selecting what evidence to present." (Docket Entry No. 26 at 4). He similarly argues that his decisions on producing and withholding evidence after the indictment were a critical part of his trial preparation and part of his core prosecutorial functions.
A prosecutor cannot be liable for damages for decisions on presenting evidence to a grand jury or for "certain investigative activity prior to the presentation of a case to the grand jury, such as interviewing witnesses who will appear before the grand jury, [that fall] within the Imbler shelter." See Morrison v. Baton Rouge , 761 F.2d 242 (5th Cir. 1985) ; see also Doe v. Harris Cty. , 2017 WL 4402590, at *12-13, 2017 U.S. Dist. LEXIS 162585, at *32-33 (S.D. Tex. Sept. 29, 2017) ("Absolute immunity also protects a prosecutor when he evaluates evidence and presents that evidence at trial or before a grand jury even if the evidence is false."). "Both the Supreme Court and the Fifth Circuit have held that prosecutors are entitled to absolute immunity even when they are alleged to have knowingly presented perjured testimony, failed to disclose exculpatory evidence, and engaged in other malicious acts so long as the statements are related to the proceedings in which they were made." Doe , 2017 WL 4402590, at *17, 2017 U.S. Dist. LEXIS 162585, at *43 (citations omitted).
To the extent that Brown's claims against Rizzo relate to preindictment "investigatory" functions that would normally be carried out by officers or detectives, then he may be able to state a claim to overcome Rizzo's absolute immunity. But Brown bases his § 1983 claims against *771 Rizzo on his conduct in interviewing witnesses who would appear before the grand jury; presenting evidence to the grand jury before the indictment; and withholding or ignoring evidence after the indictment. Brown cannot state a claim as to these acts, because they are "intimately associated with the judicial phase of the criminal process." Loupe , 824 F.3d at 539. The § 1983 claims against Rizzo are dismissed, without prejudice and with leave to amend, consistent with this ruling and with Rule 11. The claims against Harris County that depend on Rizzo's liability are dismissed on the same basis.
E. The Motion to Dismiss by the City of Houston, Houston Police Department Detective McDaniel, and Officers Bloyd and Robertson
The City of Houston argues that it is entitled to governmental immunity and that McDaniel, Bloyd, and Robertson are entitled to qualified immunity.
1. Qualified Immunity
Officers Bloyd and Robertson argue that they are entitled to qualified immunity because the only allegation against them is that they pressured, threatened, and intimidated Dockery to induce her to give false statements before the grand jury. McDaniel argues that he is entitled to qualified immunity for the allegation that he concealed evidence-the phone records. (Docket Entry No. 24 at 6-7). All three defendants argue that their actions were objectively reasonable at the time and did not violate any clearly established constitutional right.
Brown argues that the individual defendants are not entitled to qualified immunity because: (1) they failed to plead the affirmative defense in an answer instead of a motion to dismiss; (2) they argue for an inappropriate heightened pleading standard; and (3) they acted unreasonably in violation of Brown's clearly established constitutional rights.
Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Kinney v. Weaver , 367 F.3d 337, 349 (5th Cir. 2004) (quoting Harlow v. Fitzgerald , 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ). "To be 'clearly established' for purposes of qualified immunity, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " Id. (quoting Anderson v. Creighton , 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ). "Thus, as [the Fifth Circuit] has recognized, in light of the Anderson definition of 'clearly established,' the question 'whether the ... right was clearly established at the time the defendant acted ... requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident.' " Id. (quoting Conroe Creosoting Co. v. Montgomery County , 249 F.3d 337, 340 (5th Cir. 2001) ). The "clearly established" standard does not require that the "facts of past cases were 'materially similar' to the conduct being challenged." Id. at 350 (citing Hope v. Pelzer , 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ). "Qualified immunity should not be denied unless the law is clear in the more particularized sense that reasonable officials should be 'on notice that their conduct is unlawful.' " Id. (quoting Saucier v. Katz , 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ). "Therefore, before engaging in the inquiry into whether the official unreasonably violated clearly established law, [the court] should first determine whether *772 the challenged conduct, viewed in the light most favorable to the plaintiff, would actually amount to a violation of federal law in the first place." Id. (citing Saucier , 533 U.S. at 201, 121 S.Ct. 2151 ).
"When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." Club Retro LLC v. Hilton , 568 F.3d 181, 194 (5th Cir. 2009) (citing McClendon v. City of Columbia , 305 F.3d 314, 323 (5th Cir. 2002) (en banc) ). "To discharge this burden, 'a plaintiff must satisfy a two-prong test.' " Id. (quoting Atteberry v. Nocona Gen. Hosp. , 430 F.3d 245, 251-52 (5th Cir. 2005) ). "First, he must claim that the defendants committed a constitutional violation under current law." Id. (citing Wilson v. Layne , 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ). "Second, he must claim that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of.' " Id. ; see also Pearson v. Callahan , 555 U.S. 223, 241, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (lower courts need not adhere strictly to the sequence of the Saucier steps and that the order is at the sound discretion of the court).
Brown's first argument, that the defendants must raise the defense of qualified immunity in an answer instead of a motion to dismiss, is unavailing. See, e.g. , 33 WRIGHT & MILLER, FED. PRAC. & PROC. JUDICIAL REVIEW § 8329 (2017) (The defense of qualified immunity may be raised in a motion to dismiss and a motion for summary judgment) (citing Behrens v. Pelletier , 516 U.S. 299, 307, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) );[3] see also , Waganfeald v. Gusman , 674 F.3d 475, 483-84 (5th Cir. 2012) ("Qualified immunity should be adjudicated at the earliest possible stage in the litigation.").
Brown relies on Schultea v. Wood , 47 F.3d 1427, 1430 (5th Cir. 1995), and several cases from the Northern District to argue that the affirmative defense of qualified immunity cannot be raised in a motion to dismiss. The defendants are correct that Schultea addressed the requirements for an amended complaint filed on remand. See 47 F.3d at 1430 ("Our task today is to explain the measure by which to judge the adequacy of any amended complaint Schultea may file on remand. It is the occasion for our revisit of Elliott . As we will explain, we stand by our insistence that complaints plead more than conclusions, and that a plaintiff can, at the pleading stage, be required to engage the affirmative defense of qualified immunity when invoked. However, we will no longer insist that plaintiff fully anticipate the defense in his complaint at the risk of dismissal under Rule 12."). As the defendants also note, the Fifth Circuit has since addressed several interlocutory appeals denying qualified immunity raised at the motion-to-dismiss stage, without stating the rule that Brown proposes. See, e.g. , Morgan v. Swanson , 659 F.3d 359 (5th Cir. 2011) (en banc) (reviewing the district court's denial of a motion to dismiss for qualified immunity); Club Retro , 568 F.3d at 194 (reviewing the district court's denial defendants' motion to dismiss on the ground of qualified immunity); Brown v. Miller , 519 F.3d 231 (5th Cir. 2008) (reviewing the district court's denial of the defendant's motion to dismiss on the basis of qualified immunity after requiring the plaintiff to file "a reply brief in accordance with Fed. R. Civ. P. 7(a) and [the Fifth Circuit's] holding in Schultea v. Wood to plead specific facts *773 that would overcome [the defendant's] assertion of qualified immunity.").
The Fifth Circuit has clarified its Schultea holding in Anderson v. Valdez , stating:
As a preliminary matter, [the defendant] suggests that [the plaintiff's] claim is subject to a heightened pleading standard because [the defendant's] Rule 12(b)(6) motion to dismiss asserts a defense of qualified immunity. But, as [the plaintiff] correctly notes, [the defendant] misconstrues this court's precedent in Schultea v. Wood . We explained in Schultea that when, as here, a qualified immunity defense is asserted in an answer or motion to dismiss, 'the district court must'-as always-do no more than determine whether the plaintiff has 'file[d] a short and plain statement of his complaint, a statement that rests on more than conclusions alone.' In so doing, we expressly required the district court to apply 'Rule 8(a)(2)'s short and plain' standard' to the complaint. After applying this general pleading standard to the complaint, 'the court may [then], in its discretion, insist that a plaintiff file a reply tailored to [the defendant's] answer [or motion to dismiss] pleading the defense of qualified immunity.' Even if the district court does so insist, Schultea requires it to apply the Rule 8(e)(1)'s standard to the reply, emphasizing that it is '[t]he only ... Rule that governs the content of ... replies.' Unlike Rule 8(a)(2), Rule 8(e)(1) 'demands that [e]ach averment of a pleading shall be simple, concise, and direct.' Schultea further clarifies that the heightened pleading standard derived from Rule 9 does not apply to the complaint or to any reply merely because an answer or motion to dismiss asserts a defense of qualified immunity. We therefore apply the general pleading standard derived from Rule 8(a)(2) in considering whether a plaintiff has stated a retaliation claim.
845 F.3d 580, 589-90 (5th Cir. 2016). Brown's assertion that a qualified-immunity defense must be raised in an answer over a motion to dismiss is unpersuasive.
Anderson does, however, support Brown's claim that he is not subject to a heightened pleading standard at this stage of the litigation. While Brown bears the burden to defeat a qualified immunity defense, he need not do so at this stage. See, e.g. , Anderson , 845 F.3d at 589-90 ; Martone v. Livingston , No. 4:13-CV-3369, 2014 WL 3534696, at *4, 2014 U.S. Dist. LEXIS 96375, at *12 (S.D. Tex. July 16, 2014) ("In the context of a motion to dismiss, the plaintiff's burden is discharged if 'the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity.' "[4] ); O'Bryant v. Walker Cty. , No. H-08-1880, 2009 WL 212933, at *2-3, 2009 U.S. Dist. LEXIS 6301, at *5-6 (S.D. Tex. Jan. 29, 2009) ("At the motion to dismiss stage, a Section 1983 cause of action survives a qualified immunity challenge if the allegations in the complaint [evidence] 'an objectively unreasonable violation of a clearly established right.'[5] If, on the other hand, the evidence viewed most favorably to the nonmovant gives rise to a difference of opinion as to the lawfulness of the action among reasonably competent officers, the police officer is entitled to qualified immunity.").
Under that standard, the issue is whether Brown has alleged facts that, if true, show an objectively unreasonable violation of a clearly established right. Brown argues that each defendant violated his clearly established 14th Amendment due-process rights, in a way that any reasonable *774 officer would have known was unconstitutional. (Docket Entry No. 32 at 17).
For McDaniel, Brown argues that deliberately concealing exculpatory violates clearly established constitutional principles. (Docket Entry No. 32 at 17). In Rodriguez v. City of Houston , No. H-06-2650, 2007 WL 1189639, at *3-4, 2007 U.S. Dist. LEXIS 28884, at *12-14 (S.D. Tex. Apr. 19, 2007) (Atlas, J.), the court denied the defendant's motion to dismiss the plaintiff's § 1983 action for an alleged Brady violation, stating as follows:
Although civil claims brought under § 1983 for denial of Fourteenth Amendment due process rights based on a public officer's alleged concealing of exculpatory evidence may be considered in the context of Brady , due process civil claims are not always strictly limited by the criminal rules of the Brady framework. Brady is relevant to such civil claims as one important parameter because failure to reveal clearly exculpatory information 'violates clearly established constitutional principles.' Brady may, depending on the facts, provide a defense to civil defendants on due process claims predicated on the suppression of Brady material. [The defendant], however, has not identified any material omissions in Rodriguez's pleadings, even if [the plaintiff's] theory of the case is strictly constrained by the Brady standards. Rule 12(b)(6), therefore, does not support dismissal ....
(citations omitted); see also Hernandez v. Terrones , 397 Fed.Appx. 954, 971 (5th Cir. 2010) ("[I]t was clearly established law in 1994 that Brady applied to police officers" who elicited false evidence or deliberately concealed exculpatory evidence).
McDaniel argues that Brown alleges a clearly established right at an inappropriately high level of generality and that the appropriate inquiry is whether a reasonable detective would know that his conduct was unlawful under the circumstances. (Docket Entry No. 33 at 18). Brown, however, defines the violation quite specifically as a Brady violation of knowingly concealing exculpatory evidence. McDaniel's argument is that a reasonable officer would not have known that concealing exculpatory Police Department records in his home garage would be unlawful. To state that argument reveals it as unpersuasive, particularly in light of the years of delay in producing the records, even when they were sought in the state litigation.
McDaniel argues that Brown draws an illogical inference that he knowingly and intentionally concealed records. (Docket Entry No. 33 at 17). McDaniel argues that he would not have turned the records over to the District Attorney if he intended to conceal them. Drawing all reasonable inferences in favor of Brown, however, the facts alleged support his § 1983 claim. The phone records were "discovered" in McDaniel's home garage after Brown's trial and conviction. The records included handwritten notations by McDaniel made during the investigation. These notations made it clear that McDaniel was aware during the investigation that the records corroborated Dockery's testimony about Brown's alibi. Brown argues that it was objectively unreasonable for the records to have been in McDaniel's home garage at all. He notes that they were not produced until years later, and not until after Brown's habeas counsel specifically subpoenaed the records. Even then, the production was delayed. The first response to the subpoena was that the officers had conducted a diligent search of their files and found no records. McDaniel in fact had kept these police department records in his garage for years. When the records were finally produced, Texas Court of Criminal Appeals found their suppression to be a Brady violation and vacated Brown's conviction on that basis.
*775 Brown has clearly alleged sufficient facts to state a claim that McDaniel knowingly concealed exculpatory evidence in an objectively unreasonably manner that violated Brown's clearly established constitutional rights. McDaniel is not entitled to qualified immunity on the basis of the facts Brown alleges and the record provides.
As to Bloyd and Robertson, Brown alleges that they elicited false testimony from Dockery and concealed exculpatory evidence from the grand jury. Brown relies on Geter v. Fortenberry , 849 F.2d 1550 (5th Cir. 1988). In Geter , the allegations were similar to those at issue here. The plaintiff alleged that the officer obtained false identifications of the defendant by unlawful means and deliberately concealed exculpatory evidence. Brown alleges that Bloyd and Robertson threatened and pressured Dockery into maintaining her false testimony after she was released from jail, and that they obtained three false witness statements after concealing the exculpatory phone records. (Docket Entry No. 1 at 40).
The defendants argue that Geter is factually distinguishable because the "conduct was directly focused on the defendant." (Docket Entry No. 33 at 16). By contrast, they argue, the conduct alleged here related to another person, Ericka Dockery. The defendants appear to make a standing argument, that the officers violated Dockery's rights and therefore Brown has no standing to assert a violation of his own rights. But here, as in Geter , the false statements elicited from witnesses were "directly focused on the defendant" and taken to secure the (innocent) defendant's indictment and conviction.
In Geter , the Fifth Circuit reversed and remanded the lower court's denial of summary judgment, because the plaintiff had failed to identify specific facts about the officer's actions, but instead relied on conclusory statements. 849 F.2d at 1559. Here, by contrast, Brown alleges specific threats made to specific witnesses to elicit specific false testimony against him. The defendants' argument that "encouraging a witness to cooperate with authorities and informing them of the realistic consequences/penalties of not cooperating and/or lying to the authorities does not violate any constitutional right" of the wrongfully targeted defendant is unpersuasive. (Docket Entry No. 33 at 17). Brown's allegations describe much more than encouraging a witness to cooperate or informing the witness about the potential consequences. Instead, Brown describes, in detail, threats and coercion against different witnesses to obtain false testimony against him. Brown has alleged sufficient plausible facts to survive a motion to dismiss on this issue.
The defendants also argue that Brown cannot sustain a "reckless investigation" claim under § 1983. (Docket Entry No. 33 at 19). To the extent that Brown makes a claim for an independent constitutional violation of a right to be free from reckless investigation, the defendants are correct. See Hernandez , 397 Fed.Appx. at 966 ("[W]e conclude that there was no freestanding, clearly established constitutional right to be free from a reckless investigation at the time ...."). However, under Hernandez , conduct amounting to a reckless investigation can support a § 1983 claim under for malicious prosecution. Id. ("We did not hold that the negligent investigation and ignoring of exculpatory evidence in Sanders were freestanding constitutional violations, rather, they were conduct supporting Sanders' claims for false arrest and illegal detention [under § 1983]."). To the extent that Brown's allegations of reckless investigation *776 support his theory of liability for malicious prosecution under § 1983, dismissal is unwarranted.
2. Governmental Immunity
The City of Houston argues that Brown's official capacity claims against Bloyd, Robertson, and McDaniel are claims against the municipality and that Brown cannot show that the relevant decisionmakers had any actual knowledge of, or acted with deliberate indifference to, constitutional violations, as required for municipal liability. (Docket Entry No. 24 at 8). The City also argues that Brown does not identify a specific policymaker or a formal policy or widespread custom sufficient to establish liability. (Docket Entry No. 24 at 8). Finally, the City argues that Brown does not allege facts sufficient to show deliberate indifference or to sustain a claim of liability by ratification. (Docket Entry No. 24 at 9-10). In response, Brown argues that the City of Houston is not entitled to governmental immunity because it ratified the misconduct of its officers and maintained unconstitutional policies and customs.
The official-policy arguments made by and against the City of Houston echo the arguments made as to Harris County. As with those arguments, the court finds that Brown has alleged sufficient facts for this stage of the litigation. He has identified the policymakers: Chief Bradford and Chief Hurtt of the Houston Police Department. He has identified the policies or customs and practices: to manipulate witness recollections, fail to keep and maintain adequate records, manufacture evidence, and fail to disclose exculpatory evidence. And he has identified the causal link: these policies or customs and practices led to Brown's wrongful conviction, in violation of his constitutional rights. Brown relies on a pattern of similar violations, citing examples dating back to the 1970s. Brown also argues that it would be premature to dismiss the claims at this stage, before discovery, because evidence of the policies and customs are in the exclusive control of the Houston Police Department. See, e.g. , Thomas , 800 F.Supp.2d at 843 ; Sanchez , 283 F.Supp.3d at 538-40.
The City argues that Brown has failed to show that the relevant decisionmakers had actual or constructive knowledge of a pattern of constitutional violations. Brown cites examples from 2005 and 2009 in which the Houston Police Department dealt with mishandled evidence and irregularities from its crime lab. The City responds that these examples post-date Brown's 2003 conviction and fail to establish that the City knew of a pattern of violations at the time of Brown's alleged harm. The pleading standard for municipal liability articulated in Thomas recognizes the unique circumstances these kinds of claims present, stating that it is "exceedingly rare" that a plaintiff would be privy to the specific facts of internal policies before discovery. 800 F.Supp.2d at 842. Still, "a plaintiff suing a municipality must provide fair notice to the defendant" of the claims asserted. Id. at 843. "Allegations that provide such notice could include, but are not limited to, past incidents of misconduct to others, multiple harms that occurred to the plaintiff himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, or the specific topic of the challenged policy or training inadequacy." Id. at 843-44. "Those types of details, or any other minimal elaboration a plaintiff can provide, help to satisfy the requirement of providing not only fair notice of the nature of the *777 claim, but also grounds on which the claim rests, and also to permit the court to infer more than the mere possibility of misconduct." Id. (citations omitted). "Where a plaintiff provides more than a boilerplate recitation of the grounds for municipal liability, and instead makes some additional allegation to put the municipality on fair notice of the grounds for which it is being sued, federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." Id. at 844-45 (citations omitted).
Brown has met this standard. He has provided fair notice to the City of the allegations, including specific examples that permit the court "to infer more than the mere possibility of misconduct." Id. at 844 (quoting Ashcroft v. Iqbal , 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Brown is not required to allege, much less prove, more at this stage. The City's motion to dismiss is denied.
Finally, Brown argues that the City of Houston is liable based on a ratification theory. See Praprotnik , 485 U.S. at 127, 108 S.Ct. 915 ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."); see also Santibanes v. City of Tomball , 654 F.Supp.2d 593, 611 (S.D. Tex. 2009) ("[L]iability may also occur when the municipality's policymakers condone or otherwise adopt the creation of a custom by knowingly ratifying the illegal or unconstitutional actions of subordinate, non-policymaking employees.") (citing Turner v. Upton County , 915 F.2d 133, 135 (5th Cir. 1990) ).
The court in Santibanes discussed the ratification theory described by the plurality in Praprotnik , which allowed liability based on a single incident of ratified conduct, and noted that "[o]n various occasions since Praprotnik , and on at least one occasion pre-dating the case, the Fifth Circuit has either recognized or indicated that it would give favorable treatment to this so-called 'ratification' theory." 654 F.Supp.2d at 612-13. Brown argues that the actions of the Houston Police Department detectives were "subject to no investigation, no reprimand and no consequences whatsoever by the Houston Police Department or its Chief" and that the Houston Police Department's refusals to address the misconduct rises to the level of ratification. (Docket Entry No. 32 at 27). The City argues that the ratification theory is limited and applies only in extreme situations not present here. See, e.g. , Peterson v. City of Fort Worth , 588 F.3d 838, 848 (5th Cir. 2009) (the common and known use of excessive force within a police department does not constitute ratification, nor does a policymaker defending conduct that is later shown to be unlawful); Milam v. City of San Antonio , 113 Fed.Appx. 622, 626-27 (5th Cir. 2004) ("It is important to recognize that the ratification theory, in whatever context it arises, is necessarily cabined in several ways. Praprotnik itself recognized that policymakers who 'simply go[ ] along with' a subordinate's decision do not thereby vest final policymaking authority in the subordinate, nor does a 'mere failure to investigate the *778 basis of a subordinate's discretionary decisions' amount to such a delegation. Such limitations on municipal liability are necessary to prevent the ratification theory from becoming a theory of respondeat superior , which theory Monell does not countenance."). Here, Brown argues that the failure to investigate constitutes ratification. This is not enough to sustain a § 1983 claim against the City on this theory, and this claim is dismissed, without prejudice and with leave to amend.
III. Conclusion and Order
Brown's claims are not barred by the statute of limitations. Brown has alleged sufficient facts to state a claim against Harris County for unconstitutional policies. Harris County's motion to dismiss on this basis is denied. Brown has not alleged sufficient facts to state a claim against Harris County for a failure to train in Brady obligations. That claim is dismissed, with prejudice, because amendment would be futile. Brown has failed to state a claim that overcomes Rizzo's defense of absolute immunity. Rizzo's motion to dismiss is granted, and counts one and two against Rizzo are dismissed, without prejudice and with leave to amend. The County's motion to dismiss the claim against it based on Rizzo's conduct is granted, without prejudice and with leave to amend.
Brown has stated sufficient facts to overcome the qualified immunity defense of Bloyd, Robertson, and McDaniel, and Brown has sufficiently stated a claim against the City of Houston for unconstitutional policies. The motions to dismiss on that basis are denied. Brown has failed to state a claim against the City for ratification of the police officers' conduct. That claim is dismissed, without prejudice and with leave to amend.
An amended complaint must be filed by March 29, 2018. A scheduling order will be separately entered.

Brandley was abrogated in part by Mapes v. Bishop , 541 F.3d 582, 584 (5th Cir. 2008) (per curiam). To the extent Wallace conflicts with Brandley as to when a § 1983 false-arrest cause of action accrues, Wallace abrogated Brandley .

For that reason, the court need not reach Brown's equitable tolling argument.

"Thus, Mitchell clearly establishes that an order rejecting the defense of qualified immunity at either the dismissal stage or the summary judgment stage is a 'final' judgment subject to immediate appeal." (emphasis in original).

Quoting Backe v. LeBlanc , 691 F.3d 645, 648 (5th Cir. 2012).

Citing Shipp v. McMahon , 199 F.3d 256, 261 (5th Cir. 2000).